1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    PAUL GORDON SMITH, JR.,                        No.  2:16-cv-1015 TLN CKD P

12                    Petitioner,

13        v.                                         FINDINGS AND RECOMMENDATIONS

14    TRENT ALLEN,[1]

15                    Respondent.

16

17           Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas

18    corpus under 28 U.S.C. § 2254.  A jury found petitioner guilty of the first degree murder of Lora

19    Sinner with the special circumstance of torture, false imprisonment by violence, and conspiracy to

20    commit murder.  It also found that he used a deadly weapon and inflicted great bodily injury.

21    During the penalty phase, the jury determined that a death sentence was appropriate, and the trial

22    court imposed that sentence.  On automatic appeal, the California Supreme Court reversed

23    petitioner's death sentence and imposed a penalty of life in prison without the possibility of

24    parole.  (ECF No. 22, Lodged Doc. 124.)  In his habeas petition, petitioner raises the same 14

25    claims he brought before the California Supreme Court on direct review.  (Compare ECF No. 1

26    with ECF No. 22, Lodged Doc. 121; see also ECF No. 22, Lodged Doc. 123.)  For the reasons

27    _____

      [1]  Trent Allen, acting Warden of Salinas Valley State Prison, is hereby substituted as the

28    respondent in this action pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases.

stated below, this Court recommends that petitioner's petition for a writ of habeas corpus be denied.

I. Background

In its opinion, the California Supreme Court summarized the evidence presented during the guilt phase as follows:

> *A. Guilt Phase*
>
> *1. Prosecution*
>
> In December 1997, defendant was 21 years old and living with his father in Redding. During that month he met his younger half sister, Lori Smith, for the first time. Lori had been living in Washington State. Defendant's older brother, Timothy Smith, also arrived from Washington with his fiancée, Lora Sinner.[]
>
> Defendant married Jessica Smith in January 1998. Shortly thereafter, he began a relationship with Amy S., a 14-year-old runaway. Defendant's friend Eric Rubio became romantically involved with defendant's sister Lori. Sinner ended her engagement with Timothy and began to associate with defendant, Amy, Eric, and Lori. Toward the end of February this group, led by defendant, began an extended camping trip on private land in Shasta County.
>
> Of the five, Sinner was the only person without a partner. She flirted with defendant, which angered Amy. Defendant returned Sinner's attention in order to maintain access to her car, which they used to drive into town from camp. About a week before Sinner's murder, Lori and Amy discussed beating her up, and defendant told Eric he wanted to "off this bitch," referring to Sinner. Lori testified that during a conversation with everyone except Sinner, defendant said Sinner should be killed. Eric remembered the conversation, but not who made the comment.
>
> On the afternoon of the murder, Lori and Amy again spoke about beating Sinner. According to Lori, defendant encouraged them because he wanted Amy and Sinner to fight over him. Eric testified that defendant told him "the girls" wanted to fight Sinner, and he didn't know what to do about it. Eric said defendant displayed no signs of intoxication that afternoon. Toward the end of the day, Amy punched Sinner in the face. Sinner punched back, and Lori joined the fight. Defendant and Eric were in a tent about 15 feet away.
>
> Amy testified that Lori knocked Sinner's head against a tree several times. Amy struck her in the head five or six times with a large can of chili, which she tossed aside after it was dented. Lori slammed Sinner's head into a large rock. Meanwhile, Amy retrieved two pieces of an automotive dent puller. One piece was a metal bar about an inch and a half thick and a foot long. The other was a weighted metal piece shaped like a barbell. As Sinner sat on the ground, Amy and Lori repeatedly hit her with these implements. Sinner was crying

2

and asking them to stop.  Amy admitted taunting Sinner during the assault.

Lori's account differed somewhat.  She did not remember hitting Sinner's head on a tree or a rock, nor did she remember any taunting. She testified that after punching Sinner with her fists, she retrieved the dent puller bar from the tent.  Defendant and Eric were watching the assault.  Lori hit Sinner with the bar as hard as she could two or three times.  She also hit her with the chili can after Amy dropped it.

Eric testified that he and defendant were in the tent when the fight started.  They could hear but not see the beating.  Defendant showed no interest, saying, "just let them fight."  Amy had taken one piece of the dent puller from the tent, and Lori the other.  Eventually, defendant intervened.

Amy confirmed that defendant stopped the fight.  He told them to take Sinner down to the creek and clean her up.  Lori maintained it was her idea to take Sinner to the creek.  There, she and Amy scooped water onto Sinner's head to wash the blood from her hair.  Eric and defendant also came to the creek.  According to Lori, defendant took her aside, held out an ax, and said, "Just finish her off."  Lori refused. Defendant had no apparent difficulty walking or talking; Lori did not know if he had taken any drugs that day.  They all returned to the tent.  Lori did not see what defendant did with the ax. The couples sat in the tent; Sinner sat on a mat outside the door.

Defendant produced a bottle of whiskey, which the couples shared. Defendant then gave the bottle to Sinner, telling her it would help with the pain.  Sinner took a small drink.  Defendant became angry, and asked Eric to help tie her up.  After initially refusing, Eric put a noose around Sinner's neck.  Defendant tied her hands and feet. Sinner was crying.  Defendant, still angry, told her she was going to kill herself.  He said she was in enough pain already and might as well join her mother, who had died recently.  Declaring that Sinner's death was going to look like a suicide, defendant untied her hands, handed her a razor blade, and told her to cut her wrists. Sinner cried and refused at first, then cut her wrist once. Saying the cut wasn't deep enough, defendant took the blade, slashed her wrist, and handed the blade back to her.   Sinner tried to inflict another wound. Defendant, unsatisfied, took the blade back and cut her wrist repeatedly.

Defendant told Sinner to hold her wrists over a fire pit.  Lori testified that defendant struck Sinner's hands several times with the bar when she moved them. He also kicked her in the forehead and poured whiskey over the bleeding cuts, causing Sinner to scream.  He forced her to drink more liquor.  Then he wrapped a plastic garbage bag around her head, cinching it tightly.  Sinner continued crying and pleaded for help.  Defendant struck her on the neck and back several times with the bar, then asked if anyone else wanted to hit her, looking at Lori.  Lori was scared but wanted to prove she wasn't afraid to hurt someone.  She hit Sinner with the bar twice in the head and neck, and said she was "hard to kill."  Defendant snatched the

3

bar, told Lori she wasn't doing it right, and hit Sinner several more times.  When a blow produced a snapping sound, he stopped.

Eric and defendant buried Sinner.  Lori testified that Eric was frightened and shaking.  When the men returned, defendant said "she knew too much," and he feared she would say something.  Lori understood him to mean that Sinner would tell the police he had been stealing purses from cars.  Defendant warned the others that anyone who revealed what had happened would be the next to die.  They agreed to say they had put Sinner on a Greyhound bus. The next morning, they burned her clothing and belongings at the burial site.

Amy's testimony about the events following the fight was roughly consistent with Lori's, though she was hazy on many details, particularly defendant's statements.  She said defendant did not appear to be drunk or under the influence of drugs.  She remembered Lori saying, "This bitch won't die" as she struck Sinner with the bar. Amy did not mention defendant having an ax, or asking Lori to "finish her off."  Amy could hear Sinner breathing against the plastic wrapped around her head just before defendant and Eric carried her away to bury her.

Eric's account was similar. He said he did not join the others at the creek, but stayed on the bank with a flashlight, watching.  He did not see defendant with an ax.  Defendant said Sinner wouldn't survive because her skull was cracked and the back of her head was "mushy." Eric admitted helping bind Sinner. He related that defendant cut Sinner's wrist, poured alcohol on the wounds, and kicked her in the head when she did not obey his directions.  According to Eric, Sinner was still breathing after the final blow.  Defendant then cinched the bags around her head and held them for 30 to 60 seconds, saying she would die more quickly that way.

Eric initially refused to help dispose of the body.  Defendant told him he had better, "or I would end up just like her."  Frightened, Eric helped defendant bury Sinner.  They stripped the body first because, defendant said, it would decompose faster.  Afterward, defendant instructed the others to say Sinner had gone back to Washington.  He told them "we would all end up like her if we said anything."  In the morning, they burned Sinner's clothes on top of the grave. Defendant said this would keep animals from digging her up.

The murder came to light some weeks later when Lori confessed to acquaintances that she and defendant had "beat and tortured" Sinner to death.  While in jail, defendant participated in two videotaped interviews with detectives and two audiotaped interviews with a newspaper reporter.  The tapes were played for the jury.  In the first interview, defendant was given *Miranda* warnings and said he understood them. (*Miranda v. Arizona* (1966) 384 U.S. 436.)  He denied committing the murder but said he would take the blame because he was the only one of the group who could tolerate prison. Eventually, he began providing details.  He said Sinner could have died from either a head wound or asphyxiation, but "would have died regardless."  He described her injuries, then recounted the following events after she was washed in the creek:

4

"Went back up to the top of the hill, resumed, she was tied up, laid down, by the fire pit, laughed at.  Comments were made towards her, she was kicked, her hand was broken, she was hit in the back with a metal pipe, bar.  She was hit in the back of the head, repeatedly in the back of the neck and the back of the head, I remember the blood splattering.  And she just didn't move no more.  She wasn't making no noise.  Just kind of like laid there, then . . . a piece of plastic was put around her face and then another piece of plastic, but she was already dead."  Defendant admitted getting Eric to help him bury the body.  He conceded he could have stopped the attack, and had no reason why he did not.

Defendant continued giving details, without identifying his role.  He said Sinner "was . . . given options, suicide. . . .  She was given a razor blade and told to cut her own wrists. . . .  She uh couldn't cut her own wrists she was kind of too drunk . . .  wrists were cut for her, deeper.  A lot of blood.  But that wasn't enough . . . .  She was hit again with the pipe or the bar. . . .  Either in the back of the head or the back of the neck, twenty, thirty, forty, fifty times, I don't know . . . .  [S]he couldn't break her neck.  Couldn't kill her."  Defendant said Sinner had cried out in pain, but "it only brought more hits and more and more and more she kept trying, after every hit it got quieter and quieter.  Then you heard a crunch.  Something breaking, her neck breaking . . .  There was no more noise.  She didn't move.  Just laid there.  And then there was a plastic bag or something on her head.  We just held it there the whole time.  She wasn't breathing . . . and then after a few seconds, it was only a few seconds, long enough to choke her, asphyxiate anybody."

Defendant said he had been "protecting her, but I couldn't protect her when it really counted."  He admitted that Sinner had "suffered immense pain," and that "she was tortured."  He said the others would not have said anything to the authorities because "they were too scared of me."  He denied fearing that Sinner might have reported his crimes, explaining "she liked me way too much" to do that.

The next interview took place the following day.  Defendant remembered his Miranda rights, repeating them himself for the detectives.  They told him that Amy and Lori had given them a complete account of what had happened, and asked defendant to explain his role.  Defendant said the others were trying to protect him, commenting, "The only reason they didn't say something sooner is because they thought I'd kill them."  Defendant continued to take the blame, because "a brother never rats on his sister."  Told that Lori had given a written statement, defendant asked if she reported anything Sinner said about trusting him.  He said that after the initial beating, he knew she would not survive.  Defendant then offered to tell the detectives "a little story," if the recorder was turned off.

Evidently believing he was not being recorded, defendant gave a lengthy statement, including an excuse for not intervening to protect Sinner.  When the assault began, he was in the tent with Eric.  After drinking and smoking marijuana, defendant took four muscle relaxants.  He heard screaming, and saw the attack.  Lori came to the

5

tent and got the two pieces of the dent puller, which Amy and Lori used to hit Sinner. Defendant claimed he was "mesmerized" and incapacitated by the drugs.  He did not usually use medication, because he did not like to lose control.  Sinner was calling him for help, but he was unable to move.  Amy and Lori kicked and taunted her for a long time.  After about an hour defendant was able to get up and make them take Sinner to the creek.

The back of Sinner's head was "mushy," the side of her neck was blue, and her face was bloody.  She said she couldn't see.  Her hands were swollen.  Defendant brought her back to the tent and gave her whiskey.  He pulled Eric aside and asked what they should do. Sinner would not survive, and defendant did not want to see her suffer.  Eric tied her up, but defendant released her and started talking "into her ear."  He asked about her mother, and Sinner said she loved her and wished she hadn't died.  Defendant told her she was "probably going to go see [her] mom tonight, you're gonna die."  He felt sorry and responsible, and offered to "kill her for her, and end the pain quickly, as fast as I could."  He gave her more whiskey, and obtained a razor. Sinner "didn't really want to die but she accepted the fact."  After she tried to cut her wrist, defendant took the razor blade and attempted to do it himself, but was hampered by his drug ingestion and the flimsiness of the blade.

Frustrated, defendant "kept making her drink more whiskey," then sat down.  Lori began beating Sinner again.  Sinner was screaming by the time defendant was able to take the bar from Lori.  He hit Sinner twice, and realized her neck was broken.  Because she was still gasping for air, he wrapped the plastic bags around her face until she stopped breathing.  Defendant told the detectives, "If I would have had a gun I would have just killed her faster, but I had no way to kill her faster. . . .  First time in my life I haven't had a gun when I need one, when it really counted.  She didn't want to die. I had to convince her. It's not even right, but I still feel I was in the right for, I mean, do I kill her or let her suffer through the whole night."

Defendant's interviews with the newspaper reporter took place in jail several days later.   In the first, he said he had been under the influence of alcohol, marijuana, and medication.  He had killed Sinner "out of mercy and with her permission."  He heard the attack as it occurred but was unable to move because of the drugs.  He planned to plead guilty if the district attorney dropped charges against the others.  In the second interview, defendant was upset about the details that had appeared in the paper.

The forensic testimony established blood-alcohol levels of 0.78 and 0.88 percent in blood extracted from Sinner's heart.  There were at least nine incisions on her left wrist, all superficial.  While not life threatening, they would have been painful. Pouring alcohol over them would have exacerbated the pain.  The cause of death was blunt force head injuries, with asphyxiation a possible contributing cause. The exceptionally high blood-alcohol level could have been an additional fatal factor, but the level detected may have been influenced by postmortem migration of alcohol from the stomach to the heart.

6

2. *Defense*

> The defense presented numerous witnesses to impeach the truthfulness and reliability of Lori Smith. An investigating detective recounted inconsistent statements made by Lori and Eric Rubio. Forensic testimony challenged the reliability of the blood-alcohol levels found in Sinner's blood samples. A psychiatrist testified about the effects of the muscle relaxant and other drugs defendant claimed to have ingested.

(ECF No. 22, Lodged Doc. No. 124 at 2-10.)

II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our

1
2
3
4

decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

5   Bell v. Cone, 535 U.S. 685, 694 (2002) (internal citations omitted).

6        "A state court's determination that a claim lacks merit precludes federal habeas relief so

7   long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

8   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

9   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

10  state prisoner must show that the state court's ruling on the claim being presented in federal court

11  was so lacking in justification that there was an error well understood and comprehended in

12  existing law beyond any possibility for fairminded disagreement."  Id. at 103.

13       The court looks to the last reasoned state court decision as the basis for the state court's

14  judgment.  Stanley v. Cullen, 633 F.3d 852, 859-60 (9th Cir. 2011).  The California Supreme

15  Court's decision on direct appeal is the last reasoned state court decision with respect to

16  petitioner's claims.  (ECF No. 122, Lodged Doc. No. 124.)  Petitioner bears the "burden to

17  demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v.

18  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

19  III.  Petitioner's Claims

20       A.  Claims Concerning Imposition of Death Penalty

21       Petitioner presents several claims concerning his original death sentence.  Because the

22  California Supreme Court vacated petitioner's death sentence, this Court finds that claims 9, 10,

23  11, 12 and 14 are moot and will not address them.  See Dominguez v. Kernan, 906 F.3d 1127,

24  1132 (9th Cir. 2018); see also McDaniel v. Arizona, 921 F.2d 280 (9th Cir. 1990).

25       B.  Denial of Request for Change of Venue (Claim 1)

26       In his first claim, petitioner asserts that the state court violated his right to a fair trial by

27  denying a motion for change of venue in the first instance and a renewed motion for change of

28

8

1   venue during jury selection after petitioner attempted to escape jail.  Petitioner argues that the

2   pool of jurors in Shasta County were exposed to the "highly publicized and prejudicial jail

3   attempted escape and attack on a correctional officer," which took place during voir dire, and

4   prejudicial coverage of the charged offenses.  (ECF No. 1 at 6.)  Petitioner also contends that the

5   "trial court's admonitions were inconsistent and incomplete and thus cannot serve to mitigate the

6   prejudicial pretrial publicity," and the jurors' assurances of impartiality were "incomplete and

7   insufficient."  (Id.)  Respondent argues that the California Supreme Court's rejection of this claim

8   was not contrary to or an unreasonable application of established Supreme Court precedent.

9   (ECF No. 21 at 30.)

10          The California Supreme Court summarized the facts pertaining to this claim as follows:

11                  In October 2001, defendant moved to change venue from Shasta
                County.  Defense expert Stephen Schoenthaler was a professor of
12              criminal justice and a consultant on venue issues.  Schoenthaler
                reviewed local newspaper articles that appeared after defendant's
13              arrest in April 1998.  He was particularly concerned about the report
                of defendant's confession.  Confessions are strongly linked with
14              prejudgment of both guilt and penalty.  Schoenthaler also highlighted
                defendant's admission that he was using drugs and alcohol at the time
15              of the murder, the newspaper's discussion of his criminal history, and
                stories portraying the victim in a sympathetic light.
16
                    Subsequent articles had addressed a variety of topics, including the
17              prosecutor's decision to seek the death penalty, defendant's housing
                in administrative lockdown, Amy S.'s juvenile proceedings, and the
18              following details.  A psychologist in the juvenile case described
                defendant as a "cult leader."  Though married, he had seduced the
19              fourteen year old shortly after her release from a psychiatric hospital
                and recruited her into his "Charles Mason-like lifestyle."  The
20              juvenile court judge described defendant's manipulation and
                seduction of Amy, and called him the most brutal participant in the
21              killing.  Amy's statement to the police referred to Sinner's "torture."
                Defendant threatened to kill Amy if she did not keep quiet.
22              Defendant lied to police when he was arrested in a stolen car.  The
                prosecutor in Amy's case said the murder had been planned for
23              weeks, and was motivated by fear that Sinner would tell the
                authorities about the group's crimes. Amy was found guilty in the
24              "torture death."  The prosecutor in her case agreed with Sinner's
                father that other participants should receive the death penalty.  Lori
25              Smith pleaded guilty to the "sadistic killing."  Eric Rubio also
                pleaded guilty.  Defendant threatened Lori because she agreed to
26              testify against him.

27                  The court authorized a community survey.  Schoenthaler conducted
                telephone interviews with 131 Shasta County residents who qualified
28              for jury service.  Forty-nine percent of the respondents had concluded

defendant was guilty. . . Schoenthaler believed there was "far more" than a reasonable likelihood that defendant would not receive a fair trial in Shasta County. The court was not persuaded, but acknowledged that a fair trial might prove to be impossible. It deferred ruling on the venue motion until after prospective jurors were questioned.

Voir dire began in May of 2002. The court asked if prospective jurors had heard about certain aspects of the case.[4] If they remembered anything, the court asked whether they had formed any feelings or opinions about defendant's guilt or the appropriate penalty. It probed whether they could set aside the impact of media reports and decide the case based solely on the evidence presented at trial. On June 22, 2002, defendant and [Ben] Williams made [an] escape attempt in which Deputy [Timothy] Renault was assaulted and severely wounded. The next day was June 25, 2002. Defense counsel were particularly concerned with two aspects of the latest publicity: Renault's status as a correctional officer, and defendant's association with Williams, who was notorious for having set fire to a synagogue in Sacramento and allegedly murdering a local gay couple.

[N.4 The court inquired about the following subjects: Statements made by defendant to the police or newspaper; one of the participants being a juvenile; charges found true in juvenile court; defendant's relationship with a 14 year old; statements made by public officials about his culpability or the appropriate punishment; defendant's past behavior; the circumstances of the victim's life; any details involving a chili can, a dent puller, razor blades, washing in a creek, or pouring alcohol; the names Eric Rubio. Amy S., and Lori Smith; and admissions of guilt by two other charged persons.]

(ECF No. 22, Lodged Doc. No. 124 at 21-23.)

The prosecution presented evidence concerning the June 22, 2002 escape and assault upon Deputy Renault during the penalty phase. The Supreme Court summarized the evidence presented as follows:

In June 2002, defendant became angry with guard Timothy Renault over a scheduling issue. Renault overheard defendant tell another guard that if he ever got out "there would be a fight, and he would get me." The next night inmate Harold Seems saw defendant walking toward the shower next to Seems's cell. He heard defendant ask, "Do you have it?" A voice that Seems recognized as Ben Williams's answered, "Yes." Defendant said, "We're going to have to kill him." Williams replied, "Real fast." Seems assumed they were planning to assault a guard, and wrote a note of warning. Some time later, Renault appeared on his rounds. Seems held up the note and made a warning gesture. Renault ran toward a nearby door. Williams and defendant emerged from the shower, grabbed Renault, and dragged him toward the shower.

/////

10

Renault testified that he entered defendant's cell pod around 3:50 a.m. He noticed Seems at the window of his cell door, with a scared look on his face. Seems whispered, "Get out of here." Renault headed for the door and radioed the control room. As he reached for the door, he heard a shower curtain open. He turned to see Williams crouching, and a second figure in the shower stall. The two men attacked, forcing Renault into a corner and hitting him repeatedly. It felt like he was being held and hit by more than one person. The first deputy to respond heard screaming and saw defendant walking away from the shower. Williams was striking Renault's face. Deputies tackled and handcuffed Williams. Renault, covered with blood, told them that defendant and Williams had attacked him.

Nearby, deputies found a metal drain grate backed by a bar of soap wrapped in twine and strips of bedsheet, with a handle formed of tightly rolled paper. The grate in Williams's cell was missing. Renault suffered numerous injuries, including lacerations in his scalp and mouth, a skull fracture, a blood clot on the brain, fractures of the cheekbone and eye socket, a broken jaw, and a broken tooth. Plates and screws were installed in his skull and jaw to stabilize the fractures.

As defendant walked away from Renault, he passed by Seems's cell. Seems saw blood on defendant, and a bloody cloth hanging out of his pants. Deputies found blood on his hands, forearms, and shoulder. Concealed in his clothing were a two-foot-long strip of bedsheet stained with blood and a razor wrapped with twine. A piece of torn towel was tucked into the front of his underwear. Blood was spattered on his clothes and shoes. In defendant's cell, deputies found another newspaper baton and a length of string with padded loops on each end, which would have protected the fingers if the string was used as a garrote. A paper bag bearing defendant's name was found in the shower. It contained clothing, toiletries, and two lengths of rope made from sheets, one 12 feet long and the other nearly 50 feet long.

(Id. at 12-14.)

The California Supreme Court continued with its summary of facts relevant to petitioner's claim concerning the denial of a request for change of venue:

The court agreed it was necessary to reopen the voir dire of the assembled juror pool to explore the effect of media accounts of the escape attempt. However, it refused to "ask them specifically how would you feel about this kind of evidence or that kind of evidence." It invited counsel to submit questions. Going forward with the voir dire of new candidates, it asked if they had seen or heard any media reports about defendant since filling out the questionnaire. If they knew about the escape attempt, it asked whether they would be able to set aside the information during deliberations. In some instances, the court inquired whether news reports had caused any feelings about defendant's guilt, and whether the prospective jurors would be able to set aside those feelings. The court barred counsel from asking about the weight they would give to evidence of the escape attempt.

11

On June 26, 2002, defense counsel submitted a list of questions for the reopened voir dire. The court said its questioning would depend on the prospective jurors' exposure to media reports. It rejected a proposed question asking how they would be affected by the fact that a correctional officer was the victim, because "that would be asking them to prejudge evidence." Defense counsel objected to this limitation, arguing that Deputy Renault's status as a correctional officer was "relevant to bias and prejudice." Counsel compared the circumstance to a case in which a child was a murder victim. The court recognized that evidence of the assault would be admissible in the penalty phase, but maintained that questions on the subject would lead to prejudgment. It requested further briefing on how the pending motion for a change of venue was affected by the incident.

Over the following two days, the court recalled the 73 prospective jurors who had been questioned before the escape attempt. It advised them collectively about media reports in general, warning that they were incomplete and often inaccurate. It noted that if evidence of reported events is introduced at trial the evidence, but not the reports, can be considered for the purposes allowed by law. The court then questioned the prospective jurors individually about their media exposure. If they were aware of the escape attempt, it sought their assurance that they would be able to set the reports aside in determining both guilt and penalty. The court continued to resist the defense's attempts to ask questions about the impact of the victim's status as a correctional officer. It did ask one prospective juror whether her father's employment as a jail deputy would have any effect on her evaluation of the case.

After completing the reopened voir dire, the court resumed questioning new prospective jurors, again asking specifically about their awareness of murder details and generally about the recent escape attempt. After ruling on challenges for cause, the court heard argument on the venue motion. The next day it denied the motion in a written ruling. Defendant sought a writ of mandate from the Court of Appeal, arguing in part that even if prospective jurors were able to set aside the media reports of the escape attempt, there had been no voir dire exploring "the biases that unquestionably arise when there is an assault on a correctional officer, an escape attempt, or an attempted murder of a correctional officer." The writ was denied.

Defense counsel then moved unsuccessfully to disqualify the entire jury panel or to reopen voir dire, arguing that the court's questioning had been inadequate.

(Id. at 23-25.)

The California Supreme Court rejected petitioner's challenge:

Defendant argues first that the court erred by failing to grant a change of venue at the outset based on the Schoenthaler survey. However, "[t]his court has long held 'that it is no error for the trial court to postpone the consideration of an application for a change of venue until an attempt is made to impanel the jury....'" (*People v.*

12

*Bolin* (1998) 18 Cal.4th 297, 312, 75 Cal.Rptr.2d 412, 956 P.2d 374, quoting *People v. Staples* (1906) 149 Cal. 405, 412, 86 P. 886; see *People v. Wallace* (1936) 6 Cal.2d 759, 763, 59 P.2d 115.) Here, the court performed a preliminary review but deferred a final ruling until after it heard challenges for cause. We review the court's final ruling.[5]

[N.5 Defendant relies on *People v. Beames* (2007) 40 Cal.4th 907, 55 Cal.Rptr.3d 865, 153 P.3d 955. There, we said, "we do not suggest that trial courts may deny motions to change venue solely on the theory that jury voir dire is a better method of assessing the need to change venue." (*Id.* at p. 922, 55 Cal.Rptr.3d 865, 153 P.3d 955.) However, here the court did not deny defendant's motion. It merely followed the established practice of deferring its ruling. Moreover, the comments in *Beames* on which defendant relies were dicta. In that case, Beames did not seek a change of venue, but only a continuance. (*Ibid.*) We did not discuss the long line of authority noted above, which approves the practice of postponing a ruling on a motion to change venue until an attempt is made to impanel a jury.]

A motion for change of venue must be granted when "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a); see *People v. Famalaro* (2011) 52 Cal.4th 1, 21, 127 Cal.Rptr.3d 40, 253 P.3d 1185.) "The phrase reasonable likelihood in this context means something less than more probable than not, and something more than merely possible." [Internal quotation marks omitted.] (*People v. Proctor* (1992) 4 Cal.4th 499, 523, 15 Cal.Rptr.2d 340, 842 P.2d 1100 (*Proctor* ).) The relevant factors are settled: the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, and the community status of the defendant and the victim. On appeal, the defense bears the burden of showing both error and prejudice. It must establish a reasonable likelihood both that a fair trial could not be had at the time of the motion, and that the defendant did not actually receive a fair trial. We accept the trial court's factual findings if supported by substantial evidence, but independently review the court's determination as to the likelihood of a fair trial. (*Famalaro,* at p. 21, 127 Cal.Rptr.3d 40, 253 P.3d 1185.)

Here, defendant does not dispute the court's finding that his community status and that of the victim did not tend to support a change of venue. He argues, however, that the gravity of the offense, the size of the community, and the extensive media coverage weighed heavily in favor of moving the trial.

As we have noted on other occasions, "every capital case presents a serious charge. This factor adds weight to a motion for change of venue, but is not dispositive. [Citations.]" (*Proctor, supra,* 4 Cal.4th at p. 524, 15 Cal.Rptr.2d 340, 842 P.2d 1100; see, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1125, 63 Cal.Rptr.3d 297, 163 P.3d 4.) The court in this case reasonably concluded that the gravity of the offense slightly favored granting defendant's motion, but that the crime was not particularly aggravated in comparison with other capital murders. There were certainly gruesome details, but nothing

approaching the sensational overtones of other cases in which we have upheld the denial of venue motions. (E.g., *Zambrano,* at pp. 1094–1097, 1125, 63 Cal.Rptr.3d 297, 163 P.3d 4; *People v. Fauber* (1992) 2 Cal.4th 792, 818, 9 Cal.Rptr.2d 24, 831 P.2d 249.) Nor were the circumstances of the crime apt to be particularly prejudicial in Shasta County, as opposed to an alternate venue. (Cf. *People v. Davis* (2009) 46 Cal.4th 539, 578, 94 Cal.Rptr.3d 322, 208 P.3d 78.)

The population of Shasta County, which the court placed at about 168,000, was another factor weighing slightly in favor of defendant's motion.[6] In *Proctor,* we said that Shasta County's small population, approximately 122,100 at the time, tended to favor a venue change, but was not determinative.  (*Proctor, supra,* 4 Cal.4th at pp. 525–526, 15 Cal.Rptr.2d 340, 842 P.2d 1100.)  So too here.  A change of venue is not required for every capital case arising in a sparsely populated county. (*Id.* at p. 526, 15 Cal.Rptr.2d 340, 842 P.2d 1100.)

[N.6 Defense expert Schoenthaler derived a population of 163,000 from the United States census in 2000.]

The primary factor relied on by the defense below was the nature and extent of media coverage, both of the murder and of the escape attempt.  However, as to the murder reports, the voir dire record supports the court's findings that "the prospective jurors, in general, had very little knowledge of specific facts of the crimes charged, very few opinions that the defendant is guilty, and very good compliance with the [court's] orders not to read, listen to, view, or talk about the charges in *this* case or anything connected with *this* case."  The court noted that media coverage had been heavy when the crime was discovered in April 1998, subsided until September 1998 when Amy S.'s jurisdictional hearing was held, and heightened again from April through July of the following year, with Amy's dispositional proceeding and the guilty pleas of Lori Smith and Eric Rubio. Reports then "all but ceased in June of 2000," with little media attention as defendant's trial approached.[7]

[N.7 The venue motion was filed in October 2001; jury selection began in May 2002; the escape attempt was on June 22, 2002; the venue motion was denied on July 12, 2002; and trial began on July 16, 2002.]

Defendant does not dispute the court's summary of the media coverage.  He argues, however, that five of the sitting jurors had been exposed to the facts of the murder.  The exposure was minor. None of these jurors had any clearly formed memories, and several mentioned how long it had been since the news reports.  Prompted by the court for specific details, they remembered very few, and all said they had formed no preconceptions as to defendant's guilt or the appropriate punishment.[8]  Nothing in the voir dire suggests a

[N.8 Juror No. 1 "just barely" remembered the reports, "no details or no anything else."  Asked about specific aspects, he recalled none and said he had no preconceptions as to guilt or penalty.]

reasonable likelihood that defendant would not, or did not, receive a fair trial due to media reports of the facts of the crime.[9]

Juror No. 2 only "vaguely remember[ed]" reading something about the case, "because it was so long ago."  She said "the name rang a bell," but remembered none of the details mentioned by the court. The information she did recall produced no opinion on guilt or punishment.

Juror No. 5 wrote on her questionnaire that she remembered hearing four people were accused of killing a young girl; the victim was tortured; something about her father; two other females were involved; and, with a question mark, the victim had begged for mercy.  On voir dire, she said she remembered these things "vaguely," noting "it was a long time ago."  Of the details mentioned by the court, she remembered only something about the victim's father talking about his daughter and their family situation, and the chili can. She said this information did not create any feelings about defendant's guilt or punishment.

Juror No. 9 remembered having "heard something," but no details, commenting, "My memory ain't very good that long back." Questioned by the court, she recalled generally that a juvenile was involved and that defendant may have had a relationship with her. She remembered the chili can when the court mentioned it, and that it was somehow involved in the killing. She had formed no impression regarding guilt or penalty.

Juror No. 10 remembered hearing about where the murder happened, how the girl was beaten, and that "the kids were on drugs."  Prompted by the court, she remembered "maybe" that a juvenile was involved, that the victim was about ready to go back home, that a chili can and dent puller were used, and "maybe" that alcohol was poured.  She recognized the names of Eric Rubio, Amy S., and Lori Smith, but would not have been able to name them herself.  She had formed no opinion about guilt or punishment, and said she would be able to base her decision solely on the evidence presented in court.

[N.9 Defendant faults the court for deeming it a "moderating factor" that the local paper providing most of the coverage had a circulation of approximately 35,000, in a county with a population of around 168,000 and a jury pool of about 70,000.  Schoenthaler testified that each newspaper is typically read by an average of 2.2 adults. However, we are satisfied by the court's careful and thorough voir dire that the jury pool was not tainted in any significant way by newspaper accounts of the charged offenses. Schoenthaler testified that he gave no weight to the six television broadcasts concerning the murder, because "I didn't think there was a lot there, frankly."]

Defendant raises different arguments as to the publicity arising from his escape attempt.  He makes no specific claim that reports of the escape prejudiced him on the question of guilt, though he generally maintains that the publicity denied him a fair trial.  His primary

argument is that he was deprived of a fair penalty trial because of the jurors' recent exposure to the news of his attempted escape from jail and the violent attack on Deputy Renault.  Although defendant notes that seven of the sitting jurors had some knowledge of these incidents, he does not contend their voir dire responses demonstrate bias.  Instead, he claims the court's limited questioning and its restrictions on counsel's voir dire made it impossible to determine whether these jurors were able to put aside their impressions or opinions and render a verdict based solely on the evidence.  (*Irvin v. Dowd* (1961) 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751; *People v. Davis, supra,* 46 Cal.4th at p. 575, 94 Cal.Rptr.3d 322, 208 P.3d 78.)  In particular, he contends his counsel were prevented from exploring whether the escape attempt and the assault on the deputy would cause the jurors invariably to vote for death. (See *People v. Cash* (2002) 28 Cal.4th 703, 720–721, 122 Cal.Rptr.2d 545, 50 P.3d 332.)

Because we reverse the penalty judgment on other grounds, we need not consider the question of penalty phase prejudice.[10]  As for the effect of these reports at the guilt phase, we are satisfied it was insignificant.  Evidence of the escape attempt was not admitted.  No jurors were exposed to extensive reports of the assault on Deputy Renault.[11]   Moreover, the court carefully ascertained whether prospective jurors would be able to set aside whatever they had learned about the escape attempt and base their deliberations solely on the evidence at trial.  "Although the jurors' assurances of impartiality are not dispositive [citations], neither are we free to ignore them [citations].  We have in the past relied on jurors' assurances that they could be impartial.  [Citations.]  Absent a showing that the pretrial publicity was so pervasive and damaging that we must presume prejudice [citations], we do the same here." (*People v. Lewis* (2008) 43 Cal.4th 415, 450, 75 Cal.Rptr.3d 588, 181 P.3d 947.)  Defendant has not shown that pretrial publicity of the escape attempt was "so pervasive and damaging" as to cast doubt on the jurors' assurances of impartiality.  (*Ibid.;* see *Patton v. Yount* (1984) 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847.)

[N.10 Nor do we consider defendant's claim that the court erroneously excused a prospective juror based on death penalty views expressed in her questionnaire, without any voir dire. (See *People v. Russell* (2010) 50 Cal.4th 1228, 1261, 117 Cal.Rptr.3d 615, 242 P.3d 68; *People v. Stewart* (2004) 33 Cal.4th 425, 445, 15 Cal.Rptr.3d 656, 93 P.3d 271.)]

[N.11 Juror No. 1 saw a television broadcast and learned that an inmate had tricked a sheriff's officer and beaten him up. He remembered the sheriff's office saying it was working on improving security to prevent another such episode.  However, he did not know the extent of the injuries inflicted, or who was involved.  He said the incident would not affect him as a juror because he did not know if it was related to the trial.  Asked if it would make any difference if it were, he said "no."]

Juror No. 2 heard a radio report about two people in the jail, a sheriff's officer, and an incident involving a shower.  She did not

remember any other details, except for Williams's name. She was willing to set this information aside for purposes of trial, and disregard it if it were not in evidence.

Juror No. 4 heard a television broadcast about a deputy who had been beaten up, and saw defendant's picture. He remembered hearing about a broken jaw, and was aware that Williams was involved. He said he could set aside this information for purposes of trial.

Juror No. 5 saw a headline in the newspaper about a jail incident in which a deputy was injured, and photos of defendant and Williams. She did not read the story, mindful of the court's admonitions to avoid news coverage. She could set aside the information for purposes of the trial.

Juror No. 9 had heard a report on the morning news but "shut it off real quick." She heard defendant's name and that someone was beaten up, maybe a correctional officer, and something about picking a jury. She assured the court she could set aside this information and not consider it, and said it had not changed her feelings about the case.

Juror No. 10 saw headlines and defendant's picture, but closed the paper and had not listened to the news since. She knew that a guard had been attacked at the jail, and that Williams was involved. She was familiar with Williams. She said the fact that defendant and Williams were connected in the attack did not cause her any concern. She would be able to set aside what she saw in the newspaper.

Juror No. 12 heard a radio report about an incident at the jail. Her mother-in-law mentioned that defendant had hurt a guard, but the juror told her she did not want to hear anything else. She would be able to set aside this information.

The other jurors had not heard any news of the escape attempt. Defendant's claim that three sitting jurors received no admonition about the inaccuracy of media reports during voir dire following the escape attempt is baseless. At the record page he cites, the court told the assembled pool, "As you know, anything reported in the media is only reported in part and often not accurately."]

Accordingly, defendant has failed to demonstrate a reasonable likelihood that the denial of a change of venue resulted in an unfair guilt trial. Although the gravity and nature of the murder, the relatively small size of Shasta County, and the publicity surrounding the crime are all factors tending to support a change of venue, the record reflects a jury pool not predisposed against defendant on the question of guilt. Memories of media coverage of the murder had faded considerably by the time of trial. Nothing indicates that the renewed publicity occasioned by defendant's escape attempt resulted in any bias that might have affected the verdict of guilt.

(Id. at 25-32.)

/////

17

It is axiomatic that the Sixth Amendment guarantees criminal defendants the right to trial by an impartial jury.  Skilling v. United States, 561 U.S. 358, 377 (2010).  The Constitution states that the "trial shall be held in the state where the said crimes have been committed."  U.S. Const., Art. III, § 2, cl. 3; see also U.S. Const., Amend. 6 (right to trial by "an impartial jury of the state and district wherein the crime shall have been committed").  "The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'"  Skilling, 561 U.S. at 378.  To succeed on a change of venue request, the defendant must establish either presumed or actual prejudice.  Id. at 398-99; see also Murray v. Schriro, 882 F.3d 778, 802 (9th Cir. 2018).

    i.    Presumed Prejudice

The Supreme Court has made clear that presumed prejudice occurs only in extreme cases like when a conviction is obtained from a trial that is entirely corrupted by press coverage.  Skilling, 561 U.S. at 380-81 (citing Murphy v. Florida, 421 U.S. 794, 798-99 (1975)).  A juror's exposure to news accounts of the crime alone, however, does not amount to a presumption that defendant was denied due process.  Id. at 380.  "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require ignorance."  Id. at 381; see also Irvin v. Dowd, 366 U.S. 717, 723 (1961) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if a juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); Reynolds v. United States, 98 U.S. 145, 155-56 (1878) ("In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression of some opinion in respect to its merits.") The doctrine of presumed prejudice is the result of three Supreme Court cases: Rideau v.

1   _Louisiana_, 373 U.S. 723 (1963), _Estes v. Texas_, 381 U.S. 532 (1965), and _Sheppard v._
2   _Maxwell_, 384 U.S. 333 (1966).  _See_ _Skilling_, 561 U.S. at 379-81.

3          Here, the California Supreme Court stated that a change in venue must be granted when
4   there is a reasonable probability that a fair and impartial trial cannot be had.  (ECF No. 122,
5   Lodged Doc. 124 at 26.)  California courts consider five factors when ruling on a motion to
6   change venue: the nature and gravity of the crime, the size of the community, the status of the
7   victim, the status of the defendant, and the nature and extent of the publicity.  _Martinez v._
8   _Superior Court_, 29 Cal. 3d 574, 578 (1981).[2]

9          In this case, the California Supreme Court could have reasonably concluded that there was
10  no presumed prejudice.  The publicity surrounding petitioner's trial fell short of "utterly
11  corrupting" the trial environment that existed in _Rideau_, _Estes_, and _Sheppard_, the three Supreme
12  Court cases where presumed prejudice was found.  In _Rideau_, tens of thousands of people within
13  the small county "had been exposed repeatedly and in depth to the spectacle of Rideau personally
14  confessing in detail to the crimes with which he was later charged."  _Rideau_, 373 U.S. at 725-26
15  ("Any subsequent court proceedings in a community so pervasively exposed to such a spectacle
16  could be but a hollow formality.")  In _Estes_, the pretrial hearing was highly publicized by
17  television crews and news photographers who packed the courtroom and caused considerable
18  disruption to the proceedings.  _Estes_, 381 U.S. at 536, 550-51 ("This emphasized the notorious
19  nature of the coming trial, increasing the intensity of the publicity on the petitioner and together
20  with the subsequent televising of the trial beginning 30 days later inherently prevented a sober
21  search for the truth.").  And lastly, in _Sheppard_, the "jurors were thrust into the role of celebrities
22  by the judge's failure to insulate them from reporters and photographers."  _Sheppard_, 384 U.S. at
23  353-55 ("The fact is that bedlam reigned at the courthouse during the trial and newsmen took
24  /////

25  _____

26  [2]  When considering federal constitutional claims, however, the Supreme Court has adopted a
    "totality of the circumstances" approach.  _See_ _Weaver v. Chappell_, No. 1:02-cv-05583-AWI-
27  SAB, 2021 WL 4264070, at *50 (E.D. Cal. Sept. 20, 2021); _Mackey v. Asuncion_, No. 15-CV-
    03165-HSG, 2018 WL 4680190 at *28 (N.D. Cal. Sept. 28, 2018) (citing cases).

28

over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard.")

Like in Skilling, there are important differences that separate petitioner's prosecution from cases where courts have presumed juror prejudice.  Skilling, 561 U.S. at 381.  First, the state court considered Shasta County's population of about 160,000, which weighed slightly in favor of petitioner.  (ECF No. 22, Lodged Doc. 124 at 27.)  It reasoned, however, that "[a] change in venue is not required for every capital case arising in a sparsely populated county."  (Id.)  Second, although there was media coverage when the crime was discovered in April 1998, it ebbed and flowed in intensity until June 2000 when it ceased.  (ECF No. 22, Lodged Doc. 19 at 19CT4108.) There was very little media attention concerning petitioner's case in the two years preceding his trial.  (Id.; ECF No. 22, Lodged Doc. 124 at 27; see also Skilling, 561 U.S. at 383 (stating that "unlike cases in which trial swiftly followed a widely reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial."))  To the extent that petitioner argues that news of his attempted jail escape created a danger of juror prejudice, evidence of the escape attempt was not admitted at trial, and the jurors who had been exposed to media coverage stated that they could set aside this information for purposes of the trial.  (ECF No. 22, Lodged Doc. 124 at 30-31; ECF No. 22, Lodged Doc. 19 at 19CT4035-105.)[3]  The trial court also took steps to mitigate the risk of media coverage of the escape attempt by reopening voir dire, excusing prospective jurors for cause if they had formed a bias based on the escape attempt, and admonishing the prospective jurors to avoid any outside reports of the case.  (ECF No. 22, Lodged Doc. 19 at 19CT4109, 4111.)  Third, although some jurors had been exposed to the facts of the murder, they either had vague memories of the crime or had not formed preconceptions of petitioner's guilt or an appropriate punishment.  (ECF No. 22, Lodged Doc. 124 at 28.)[4]  After independently

[3] JN1 (ECF No. 22, Lodged Doc. 93 at 25RT6796-823); JN2 (ECF No. 22, Lodged Doc. 91 at 23RT6408-20); JN4 (ECF No. 22, Lodged Doc. 90 at 22RT5982-85); JN5 (Id. at 22RT6058-61); JN9 (ECF No. 22, Lodged Doc. 91 at 23RT6175-77); JN10 (ECF No. 22; Lodged Doc. 90 at 22RT6009-12); JN12 (Id. at 22RT5963-65.)

[4] JN1 (ECF No. 22, Lodged Doc. 93 at 25RT6796-823); JN5 (ECF No. 22, Lodged Doc. 86 at 18RT4678-704); JN9 (ECF No. 22, Lodged Doc. 88 at 20RT5275-5302); JN10 (ECF No. 22,

20

1    reviewing the record, most of media coverage reported facts of the crime or trial proceedings

2    related to petitioner or his co-offenders.  (ECF No. 22, Lodged Docs. 9-10 at 9CT1309-

3    10CT1425; see also Murray, 882 F.3d at 805.)  Despite media coverage about petitioner's

4    confession, none of the jurors recalled this fact when the court inquired about specific details

5    related to media coverage of the crime.  (ECF No. 22, Lodged Doc. 124 at 27-28; see also

6    Skilling, 561 U.S. at 382-83; ECF No. 22, Lodged Doc. 9 at 9CT1311.)  This Court concludes

7    that the California Supreme Court could have reasonably concluded that this case does not

8    warrant the presumption of prejudice.

9            ii.    Actual Prejudice

10           Alternatively, the standard of "actual prejudice" examines the jury voir dire to determine

11   if, notwithstanding jurors' assurances of impartiality, the record compels an inference that jurors

12   were not impartial.  Murphy v. Florida, 421 U.S. 794, 799-803 (1975).  A defendant may prove

13   actual prejudice if "during voir dire, potential jurors who have been exposed to pretrial publicity

14   express bias or hostility toward the defendant that cannot be set aside."  Murray, 882 F.3d at 802-

15   03.  Trial courts, however, have "wide discretion in conducting voir dire regarding pretrial

16   publicity and other areas that might reveal juror bias.  Mu'Min v. Virginia, 500 U.S. 415, 427

17   (1991).  A reviewing court should defer to the trial court's impartiality determination because

18   "[t]he judge of that court sits in the locale where the publicity is said to have had its effects and

19   brings to his evaluation of any such claim his own perception of the depth and extent of news

20   stories that might influence a juror."  Id.

21           The California Supreme Court could have also reasonably determined that there was no

22   actual prejudice.  Petitioner filed a motion to change venue, and the court authorized a community

23   survey of Shasta County residents.  (ECF No. 22, Lodged Doc. 10 at 10CT1427-31.)  The court

24   held a hearing on the motion to change venue on October 31, 2001, and deferred ruling on the

25   motion until after voir dire.  (ECF No. 22, Lodged Docs. 73-74 at 5RT1048-6RT1324.)  The court

26   undertook an extensive jury-selection process commencing in May 2002, which lasted about two

27   _____

28   Lodged Doc. 79 at 11RT2789-822).

1  months.  The court and the parties had an opportunity to ask questions to every prospective juror.

2  These questions included the following items that were reported in the media: petitioner's

3  statements to the police or newspaper; a juvenile being charged with this murder; the relationship

4  between petitioner and the juvenile; public officials' statements to the press regarding petitioner's

5  culpability and appropriate punishment; petitioner's past behavior; victim's life; chili can; dent

6  puller; razor blades; washing at the creek; pouring alcohol; the names Eric Rubio, Amy Stephens,

7  and Lori Smith; two other persons charged with the murder have admitted guilt.  (See, e.g., ECF

8  No. 22, Lodged Doc. 86 at 18RT4682-87.)  While voir dire was ongoing, on June 22, 2002,

9  petitioner attempted to escape jail.  Due to media coverage of the attempted escape, the court

10  agreed to reopen voir dire of the prospectively qualified jurors.  (ECF No. 22, Lodged Doc. 18 at

11  17CT3803, 3816; ECF No. 22, Lodged Doc. 88 at 20RT5510-18.)  The court independently

12  interviewed each prospectively qualified juror and excused those who had formed a bias due to

13  media exposure.  (ECF No. 22, Lodged Doc. 19 at 19CT4109.)  The jury selection process

14  continued until enough qualified jurors were identified.

15          After independently reviewing the record, this Court concludes that there is no evidence

16  of actual prejudice against petitioner.  As mentioned above, jurors with prior knowledge of facts

17  of the crime or attempted escape stated it would not influence their impartiality or were excused.

18  To the extent petitioner argues that the jurors' assurances of impartiality were incomplete or

19  insufficient to mitigate any prejudice, the Court disagrees.  In Skilling, the Supreme Court stated

20  that the "face-to-face opportunity to gauge demeanor and credibility, coupled with information

21  from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the

22  court a sturdy foundation to assess fitness for jury service."  Skilling, 561 U.S. at 395.  A review

23  of the record confirms that the trial court sufficiently evaluated each prospective juror's fitness

24  for jury service.  The trial court also mitigated any risk of actual prejudice from media coverage

25  by providing clear instructions on the duty of jurors to reach a fair and impartial verdict and to

26  avoid any outside information.  (See, e.g., ECF No. 22, Lodged Doc. 86 at 18RT4684-86; ECF

27  No. 22, Lodged Doc. 90 at 22RT6058-61; Skilling, 561 U.S. at 388 n.21.) Although petitioner

28  claims that these admonitions were "inconsistent and incomplete," the record contradicts this

1    argument.  To the extent that petitioner claims the trial court did not consistently remind the

2    jurors that media reports can be incomplete or inaccurate, ECF No. 22, Lodged. Doc. 123 at 12,

3    he fails to cite any authority to show that the trial court was required to provide this specific

4    admonition.   Petitioner has not shown that voir dire in his case violated his constitutional rights.

5            Petitioner also makes several additional arguments.  First, he contends that the trial court

6    erred by discounting the attempted escape because it resulted from his willful act.  (ECF No. 1 at

7    6.)  Although the trial court did cite this fact in its finding, the California Supreme Court did not.

8    Second, petitioner faults the trial court for finding that the local newspaper's circulation was a

9    moderating factor.  This Court agrees with the California Supreme Court that the trial "court's

10   careful and thorough voir dire that the jury pool was not tainted in any significant way by

11   newspaper accounts of the charged offenses."  (ECF No. 22, Lodged Doc. 124 at 29 n.9.)

12           This Court concludes that the state court's finding that it was not an error for the trial

13   court to deny petitioner's motion for change of venue was not contrary to, or an unreasonable

14   application of, clearly established federal law, or that such a finding was based on an

15   unreasonable application of the facts and recommends denying habeas relief on this claim.

16           C.  Voir Dire (Claim 2)

17           In his second claim, petitioner asserts his constitutional rights were violated by the trial

18   court's limited inquiry of potential juror bias after media coverage of petitioner's attempted

19   escape from the Shasta County Jail and his assault upon Deputy Renault.[5]  Respondent argues

20   that the state court's rejection of petitioner's voir dire claim was reasonable.

21           The California Supreme Court summarized the facts related to this claim as follows:

22                   . . . Defense counsel [was] particularly concerned with two aspects
             of the latest publicity:  Renault's status as a correctional officer, and
23           defendant's association with Williams, who was notorious for having
             set fire to a synagogue in Sacramento and allegedly murdering a local
24           gay couple.

25                   The court agreed it was necessary to reopen the voir dire of the
             assembled juror pool to explore the effect of media accounts of the
26           escape attempt.  However, it refused to "ask them specifically how

27   _____

28   [5] To the extent petitioner challenges the penalty phase of his trial, that argument is moot because
     the California Supreme Court vacated his death sentence.

                                                   23

would you feel about this kind of evidence or that kind of evidence." It invited counsel to submit questions. Going forward with the voir dire of the new candidate, it asked if they had seen or heard any media reports about defendant since filling out the questionnaire. If they knew about the escape attempt, it asked whether they would be able to set aside the information during deliberations. In some instances, the court inquired whether news reports had caused any feelings about defendant's guilt, and whether the prospective jurors would be able to set aside those feelings. The court barred counsel from asking about the weight they would give to evidence of the escape attempt.

On June 26, 2002, defense counsel submitted a list of questions for the reopened voir dire. The court said its questioning would depend on the prospective jurors' exposure to media reports. It rejected a proposed question asking how they would be affected by the fact that a correctional officer was the victim, because "that would be asking them to prejudge evidence." Defense counsel objected to this limitation, arguing that Deputy Renault's status as a correctional officer was "relevant to bias and prejudice." Counsel compared the circumstance to a case in which a child was a murder victim. The court recognized that evidence of the assault would be admissible in the penalty phase, but maintained that questions on the subject would lead to prejudgment. . .

(ECF No. 22, Lodged Doc. 124 at 23-24.)

The California Supreme Court rejected petitioner's voir dire claim noting that petitioner did not argue that any voir dire response demonstrated actual bias.

Instead, he claims the court's limited questioning and its restrictions on counsel's voir dire made it impossible to determine whether [the seven jurors who heard news reports of the assault and escape attempt] were able to put aside their impressions or opinions and render a verdict based solely on the evidence. *(Irvin v. Dowd* (1961) 366 U.S. 717, 723; *People v. Davis*, *supra*, 46 Cal.4th at p. 575.) . . .

. . . As for the effect of these reports at the guilt phase, we are satisfied it was insignificant. Evidence of the escape attempt was not admitted. No jurors were exposed to extensive reports of the assault on Deputy Renault. [Footnoted omitted.] Moreover, the court carefully ascertained whether prospective jurors would be able to set aside whatever they had learned about the escape attempt and base their deliberations solely on the evidence at trial. "Although the jurors' assurances of impartiality are not dispositive [citations], neither are we free to ignore them [citations]. We have in the past relied on jurors' assurances that they could be impartial. [Citations.] Absent a showing that the pretrial publicity was so pervasive and damaging that we must presume prejudice [citations], we do the same here." (*People v. Lewis* (2008) 43 Cal.4th 415, 450.) Defendant has not shown that pretrial publicity of the escape attempt was "so pervasive and damaging" as to cast doubt on the jurors' assurances

24

1
of impartiality.  (*Ibid.*; *see Patton v. Yount* (1984) 467 U.S. 1025, 1031.)

2

3
(Id. at 29-31.)

4
The Due Process Clause of the Fourteenth Amendment guarantees a defendant an

5
adequate voir dire to identify "unqualified jurors."  Morgan v. Illinois, 504 U.S. 719, 729 (1992).

6
To obtain habeas relief, "it is not enough that *voir dire* questions might have been helpful, rather

7
the failure to ask the questions 'must have rendered the defendant's trial fundamentally unfair.'"

8
Kemp v. Ryan, 638 F.3d 1245, 1261 (9th Cir. 2011) (citing Mu'Min, 500 U.S. at 425-26).

9
After reviewing the record, this Court concludes that there is nothing to suggest that the

10
trial court's denial of petitioner's request to ask prospective jurors about a correctional officer's

11
involvement in the attempted escape rendered petitioner's trial fundamentally unfair.  State courts

12
are afforded wide latitude in conducting voir dire particularly with respect to "pretrial publicity

13
and in other areas of inquiry that might tend to show juror bias."  Mu'Min, 500 U.S. at 427; see

14
also United States v. Tsarnaev, 142 S. Ct. 1024, 1034 (2022) ("Because conducting *voir dire* is

15
committed to the [trial court's] sound discretion, there is no blanket constitutional requirement

16
that it must ask each prospective juror where he heard, read, or saw about a case in the media.")

17
"No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*."  Skilling, 561

18
U.S. at 386.

19
Here, petitioner's counsel submitted a list of proposed voir dire questions concerning the

20
media coverage of the attempted escape.  (ECF No. 22, Lodged Doc. 18 at 18CT3825-26.)  The

21
court considered the request, accepting some questions and denying others.  (ECF No. 22, Lodged

22
Doc. 90 at 22RT5930-38.)  Petitioner's counsel objected to the trial court's rejection of the

23
following question — "If the victim was a Correctional Officer, Peace Officer or other Law

24
Enforcement personnel how would that change your feelings or thoughts on the case?"  (ECF No.

25
22, Lodged Doc. 18 at 18CT38256; id. at Lodged Doc. 90 at 22RT5934, 5936-38.)  The trial

26
court decided that it would not ask the question outright, but "[i]f the door opens in that extent,

27
I'm certainly willing to consider it."  (ECF No. 22, Lodged Doc. 90 at 22RT5938.)  When the

28
issue did arise, the court permitted the attorneys to ask questions about the victim being a law

1   enforcement officer.  (See, e.g., ECF No. 22, Lodged Doc. 91 at 23RT6421-23.)  During

2   individual questioning, the prospective jurors affirmed that they could set any media information

3   aside and consider only information presented in court.  The California Supreme Court's finding

4   that the trial court did not err in denying petitioner's voir dire request was not contrary to, or an

5   unreasonable application of, Supreme Court precedent.  This Court recommends denying habeas

6   relief on this claim.

7       D.  Admission of Lay Opinion Testimony (Claim 3)

8       Petitioner complains that the erroneous admission of Sergeant Clemen's testimony

9   violated his right to due process and a fair trial.  (ECF No. 1 at 8; see also ECF No. 22, Lodged

10  Doc. 121 at 188-97.)  Specifically, he raises the following four arguments: (1) testimony

11  regarding petitioner's emotional state during the police statement was irrelevant, improper lay

12  opinion, and prejudicial; (2) testimony regarding guilt was irrelevant; (3) testimony constituted

13  improper opinion testimony; and (4) the testimony was more prejudicial than probative under

14  Evidence Code section 352.  (Id.)  Respondent argues that the claim is procedurally barred, and

15  that petitioner has failed to demonstrate how the trial court's admission of the testimony was

16  contrary to, or an unreasonable application of, Supreme Court precedent.  (ECF No. 21 at 35-39.)

17      On direct appeal, the California Supreme Court considered and rejected petitioner's claim.

18          During the prosecution's case-in-chief, Detective Ronald Clemens
19      testified that defendant initially maintained his innocence but insisted
        he would take the blame for the murder. The jury watched a
20      videotape of the interview. Afterward, the prosecutor noted that
        defendant seemed to be "breaking down and crying" at several
21      points, and asked Clemens what he had observed.  Defense counsel
        objected on grounds of irrelevance and undue prejudice. The court
22      barred Clemens from giving an opinion based on the videotape,
        but allowed him to report his own observations during the interview.
23      Clemens testified that when defendant appeared to be showing
        emotion, he "would always cover his eyes with his hand.  And I
24      didn't see any tears." Clemens said defendant's eyes and face were
        not red at these times.

25          Defendant claims the admission of this testimony violated his federal
        rights to due process and a fair trial. He first contends Clemens's
26      observations were irrelevant to any issue relating to guilt. To the
        contrary, defendant's demeanor when discussing the crimes was
27      relevant to help the jury determine his intent at the time of the events,
        his state of mind thereafter, and the credibility of his account.
28      Defendant also argues that the testimony amounted to improper

26

1   opinion evidence.  Not so.[13] Clemens offered no opinion, but merely
    recounted his observations of defendant's actions and appearance.
2   "[A] witness may testify about objective behavior and describe
    behavior as being consistent with a state of mind." (*People*
3   *v. Chatman, supra*, 38 Cal.4th at p. 397, 42 Cal.Rptr.3d 621, 133
    P.3d 534.) Nor was this brief testimony prejudicial; it merely
4   supplemented what the jury had seen on the videotape.  (See *People*
    *v. Doolin* (2009) 45 Cal.4th 390, 438–439, 87 Cal.Rptr.3d 209, 198
5   P.3d 11.) Defendant offers a cursory argument that the prosecutor
    was also improperly permitted to ask Clemens, in connection with
6   the interviews of Eric Rubio and Lori Smith, "Haven't we asked all
    of our witnesses to tell the truth?" However, Clemens expressed no
7   opinion as to whether Eric and Lori were truthful in their statements.
    Defendant's arguments about opinion testimony are baseless.

8
    [N.13 Defendant's claims about Clemens's "opinion testimony" are
9   not only meritless, but also forfeited by the failure to object on that
    ground below. (*People v. Chatman* (2006) 38 Cal.4th 344, 397, 42
10  Cal.Rptr.3d 621, 133 P.3d 534.)]

11  (ECF No. 22, Lodged Doc. 124 at 35-36.)

12       Although procedural issues are often addressed before the merits, they need not be.  The

13  Supreme Court in <u>Lambrix v. Singletary</u>, 520 U.S. 518 (1997) skipped over the procedural bar

14  argument and proceeded to the merits.  <u>Id.</u> at 525 ("Despite our puzzlement at the Court of

15  Appeals' failure to resolve this case on the basis of procedural bar, we hesitate to resolve it on

16  that basis ourselves."); <u>see also</u> <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002) (stating

17  that courts may "reach the merits of habeas petitions if they are, on their face and without regard

18  to any facts that could be developed below, clearly not meritorious despite an asserted procedural

19  bar."); <u>Dean v. Schriro</u>, 371 F. App'x 751 (9th Cir. 2010).  Because this claim can be resolved on

20  the merits, this Court declines to decide whether a procedural bar precludes petitioner from

21  obtaining habeas relief.

22       Whether evidence is irrelevant, constitutes improper opinion testimony, or is inadmissible

23  under Evidence Code section 352 is a matter of state law and is not cognizable on habeas review.

24  <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68; <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009).

25  Errors of state law do not warrant federal habeas relief.  <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68; <u>Johnson</u>

26  <u>v. Sublett</u>, 63 F.3d 926, 930 (9th Cir. 1995).  The erroneous admission of evidence is grounds for

27  federal habeas corpus relief only if it made the state proceedings so fundamentally unfair as to

28  violate due process.  <u>See</u> <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991).

27

1    Assuming the claim is cognizable, "[u]nder AEDPA, even clearly erroneous admissions of

2    evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

3    corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

4    Court." Holley, 568 F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204 (9th Cir.

5    2021).  Because the Supreme Court has not clearly decided whether the admission of irrelevant or

6    unduly prejudicial evidence constitutes a due process violation sufficient to warrant habeas relief,

7    Holley, 568 F.3d at 1101, this Court cannot conclude that the state court's ruling was contrary to,

8    or an unreasonable application of, clearly established federal law.  See generally, Wright v. Van

9    Patten, 552 U.S. 120, 126 (2008) (per curiam); Bradford v. Paramo, No. 2:17-cv-05756 JAK JC,

10   2020 WL 7633915, at *6-7 (C.D. Cal. Nov. 12, 2020) (citing cases).

11   Lastly, petitioner's argument cannot succeed on the merits.  Admission of evidence

12   violates due process only if the jury could draw no permissible inferences from the evidence.

13   Jammal, 926 F.2d at 920 ("Even then, the evidence must 'be of such quality as necessarily

14   prevents a fair trial.'") (citation omitted)). That situation did not occur here.  The jury was shown

15   a videotape of petitioner's police interview with Sergeant Clemens.  After playing the tape,

16   Sergeant Clemens testified to his personal observations of petitioner's behavior during that

17   interview.  Specifically, he testified that he sat two or three feet away from petitioner, had a good

18   opportunity to see petitioner's face, and did not see "physical manifestations" of emotion,

19   including tears or red eyes.  (ECF No. 22, Lodged Doc. 101 at 33RT9341-42.)  Instead, petitioner

20   "would always cover his eyes with his hand." (Id. at 33RT9342.)  Under California law, "a

21   witness may testify about objective behavior and describe behavior as being consistent with a

22   state of mind." People v. Chatman, 38 Cal. 4th 344, 397 (2006).  The state appellate court held

23   that Sergeant Clemens did precisely that; Sergeant Clemens did not offer an opinion about

24   petitioner's state of mind.  The jury also viewed the videotaped interview and could determine the

25   veracity of the testimony for themselves.  After reviewing the record, this Court concludes that

26   the state court's finding was not objectively unreasonable and recommends denying habeas relief

27   on this claim.

28   /////

E. <u>Admission of Statements Made by Petitioner and Co-Perpetrators (Claim 4)</u>

Petitioner complains that the erroneous admission of irrelevant and prejudicial statements made by himself, and his co-perpetrators violated his right to due process and a fair trial. (ECF No. 1 at 8; <u>see also</u> ECF No. 22, Lodged Doc. 121 at 188-97.) Respondent claims that petitioner is not entitled to relief because he has not shown that admission of these statements was contrary to, or an unreasonable application of, federal law. (ECF No. 21 at 41.)

The California Supreme Court considered and denied his claims.

> Defendant contends his federal due process rights were violated by the admission of various statements made by himself and his coperpetrators.
>
> a. *Defendant's Statements*
>
> Defendant sought to have a number of his statements to Detective Clemens redacted. The court agreed to some excisions, but defendant argues that certain remaining statements were prejudicial evidence of his bad character. We disagree.
>
> In the first interview with Clemens, the following exchange occurred: "[Defendant]: I can't kill somebody like that. [Clemens]: Like what? [Defendant]: It's unmerciful. [Clemens]: You mean someone who can't protect themselves? [Defendant]: A lot of people that    deserve    to    die, people who    hurt other people." Defense counsel objected that the first and third of these statements were of little probative value, and were prejudicial because they indicated defendant could kill under other circumstances and was passing judgment on who should and should not die. The prosecutor contended the statements were probative with respect to defendant's knowledge of right from wrong, and were part of Clemens's efforts to catch him in a lie. The court overruled the objection.
>
> Later in the same interview, Clemens suggested defendant had killed Sinner to keep her from reporting his criminal activity. Defendant said: "No I wouldn't kill nobody over that. I have specific set down reasons why I would kill somebody, and I don't know why I killed her." Counsel claimed this statement was inflammatory, prejudicial, and not probative. The prosecutor argued that it went to defendant's state of mind and motive. The court admitted the statement, finding it probative in connection with defendant's comment that he did not know why he killed Sinner.
>
> The next statement was made in defendant's second interview, before he admitted his role in the killing. Counsel objected to the italicized portion of the following comments: "I wouldn't never abuse her, I wouldn't hit her, I give her whatever she asks for or wanted. Same as I do any of my friends. So she obviously trusted me, now she said something that one night, you know that you have

29

to live with your whole life, *it's not killing somebody, I don't have a problem with that. That's not what bothers me.* The killing of her bothers me, killing somebody else doesn't bother me. I don't glorify it, but I don't think it would bother me as much as this thing did." The court rejected counsel's claim that these remarks were irrelevant and inflammatory, observing that defendant was explaining his mental state, intent, or feelings about the killing.

Later in the same interview, after he admitted killing Sinner, defendant said he knew she was going to die after he examined her wounds. He added, "If I would have had a gun I would have just killed her faster, but I had no way to kill her faster .... more than willing to do my time, it's a damn shame." Clemens said, "Yes, it is." Defendant commented, "First time in my life I haven't had a gun when I needed one, when it really counted." Counsel argued that the latter statement was inflammatory, because it indicated the defendant had guns on other occasions. The court disagreed, noting, "Sounds like a statement of intent."

Defendant contends all these statements were akin to evidence of prior bad conduct, which is inadmissible to prove criminal disposition under Evidence Code section 1101, subdivision (a). He acknowledges that such evidence may be admitted under subdivision (b) of section 1101 for certain purposes, such as to prove intent, motive, or identity. However, he claims that here his statements were admitted simply to prove his criminal disposition, and were so prejudicial they should have been excluded under Evidence Code section 352.

Defendant offers no authority supporting his analogy between his own admissions and evidence of other misconduct under Evidence Code section 1101. The prohibition on the use of "other crimes" evidence to prove character is not implicated here. Defendant's statements reflected his after-the-fact feelings about the charged killing itself. They were properly before the jury as statements of a party under Evidence Code section 1220, and probative on the issues of motive, intent, and consciousness of guilt. Nor were they unduly prejudicial. Any inflammatory impact they might have had was dwarfed by the horrific nature of the acts defendant admittedly performed. (Cf. *People v. Valdez* (2012) 55 Cal.4th 82, 134, 144 Cal.Rptr.3d 865, 281 P.3d 924.) The statements were properly admitted.

b. *Coperpetrators' Statements*

Defendant challenges the admission of statements regarding "torture" made by coperpetrators Eric Rubio and Lori Smith. His briefing on this issue lacks sufficient record citations for a thorough review of his argument. "It is the duty of counsel to refer us to the portion of the record supporting [defendant's] contentions on appeal. [Citations.] ... 'It is neither practical nor appropriate for us to comb the record on [defendant's] behalf.'" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738, 69 Cal.Rptr.3d 365.) We consider the record to which counsel does refer.

In his opening brief, defendant cites two pages of the transcript where the court and counsel discuss *defendant's* statements, only one of which includes a reference to torture. These citations do not support his claim with respect to statements by others. Defendant then cites a passage in the reporter's transcript where the court resolved counsel's objection to a number of references to "torture" in a transcribed statement by Lori Smith. However, defendant fails to direct us to the clerk's transcript where those references appear in Lori's statement, nor does he discuss their context. Defendant also cites a reporter's transcript page on which the court refused to redact references to torture by Eric Rubio and, apparently, Amy S., again without citing to the transcribed statements themselves. Finally, the opening brief refers to pages where the court agreed to strike a torture reference by Eric.

In his reply brief, defendant cites two pages of a statement by Lori Smith, where the court struck two questions by the detective employing the word "torture" but not Lori's answer, "That was before ... my brother started torturing her." The reply brief also refers to a comment by Lori that defendant "started torturing her, pretty much." However, no reference is made to an objection to the latter comment, and it appears none was made. Finally, the reply brief refers to a statement by Eric that defendant was "basically torturing" Sinner, but the court redacted this statement.

Thus, the only relevant statement properly presented for the trial court's consideration and documented in this court with record references is Lori's comment, "That was before ... my brother started torturing her." In any event, defendant's arguments lack merit. He claims the coperpetrators' use of the term "torture," or their answers to questions using that term, amounted to improper lay opinion on the ultimate issue of whether defendant tortured Sinner, as alleged in the torture special circumstance. This argument was raised below and rejected. The court reasoned that while some questions about "torture" might seek to elicit an opinion, witnesses may also use the word in a purely descriptive sense to explain what they saw. In the latter situation, no improper opinion testimony is offered.

The court's reasoning was sound. Lori's statement about events before "my brother started torturing her" did not include an opinion about defendant's commission of a special circumstance. It was simply part of her narrative. A witness who uses the word "torture" in describing a sequence of events is no more testifying "in the form of an opinion" (Evid.Code, § 800) than a witness describing a "robbery." (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76–77, 17 Cal.Rptr.3d 710, 96 P.3d 30.) It is conceivable that an investigator might solicit a witness's opinion on whether a particular act amounted to "torture" for purposes of the special circumstance. But here defendant identifies no questions or statements reflecting any such improper lay opinion. The jury was instructed that the torture special circumstance required a finding that defendant intended to and did "inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose." Defendant fails to

1      show that any witness was invited to opine on whether this standard
       was met.
2

3   (ECF No. 22, Lodged Doc. 124 at 36-40.)

4          As stated above, petitioner's claims that evidence is inadmissible or constitutes improper

5   opinion testimony is a matter of state evidentiary law and is not cognizable on habeas review.

6   See Estelle, 502 U.S. at 67-68; Holley, 568 F.3d at 1101.  Assuming the claims are cognizable,

7   however, the admission of evidence can only violate due process if no permissible inferences

8   could be drawn from the evidence.  Jammal, 926 F.2d at 920.  After reviewing the record, this

9   Court concludes that it was not objectively unreasonable for the state court to find that

10  petitioner's statements were admissible for petitioner's intent, state of mind, and feelings about

11  the killings.  (See ECF No. 22, Lodged Doc. 5 at 5CT3566-80, 3727; ECF No. 22, Lodged Doc.

12  75 at 7RT1660-80.)  The statements were not so prejudicial as to raise due process concerns.

13         Petitioner also claims that the trial court improperly admitted statements regarding

14  "torture" by coperpetrators Eric Rubio and Lori Smith.  (ECF No. 22, Lodged Doc. 121 at 202-

15  06; ECF No. 22, Lodged Doc. 122 at 157-163; ECF No. 22, Lodged Doc. 123 at 31-36.)  This

16  Court agrees with the California Supreme Court that the record citations provided by the parties

17  on this issue are sparse and incomplete.  (See, e.g., ECF No. 22, Lodged Doc. 75 at 7RT1662-64;

18  id. at Lodged Doc. 76 at 8RT1725-40, 1749, 1763-64; id. at Lodged Doc. 40 at 40CT10117; id. at

19  Lodged Doc. 41 at 41CT10209; id. at Lodged Doc. 97 at 29RT7944, 8106-07.)  After reviewing

20  the record, this Court concludes that the California Supreme Court's decision was not objectively

21  unreasonable.  Petitioner has failed to identify any statements showing that petitioner's co-

22  perpetrators offered improper opinion testimony on torture as a special circumstance.  Instead, the

23  state court reasonably concluded that the witnesses used the word "torture" to describe the events

24  they witnessed, which is permissible under state evidentiary rules.  On habeas review, this Court

25  must defer to the state court's interpretation of state law.  Bradshaw v. Richey, 546 U.S. 74, 76

26  (2005).

27         Because the state court's ruling was neither contrary to, nor an unreasonable application

28  of, federal law, this Court recommends denying habeas relief on Claim 4.

F. <u>Pictures of Victim (Claim 5)</u>

Next petitioner claims that the prosecutor committed prosecutorial misconduct when he violated a pre-trial ruling by showing the jury two enlarged photographs of the victim's body where it was recovered, violating petitioner's right to a due process and a fair trial. (ECF No. 1 at 9.) In response, respondent asserts that the claim is procedurally barred and meritless. (ECF No. 21 at 42-46.)

The California Supreme Court addressed petitioner's claim on direct appeal on follows:

> On June 28, 2002, in advance of trial, the court and counsel reviewed a series of diagrams and photographs the prosecutor proposed to project onto a screen. The photographs were of the crime scene and the corpse. The projected images were approximately 6 feet wide and 4 feet high. Defense counsel objected that the prosecutor would have control over the size of the photographs when showing them at trial. The court said, "If I authorize something it's only going to be for whatever I see, and the size I say. And if there is a violation of that, then obviously that could be grounds for a mistrial." The court expressed concern about the emotional impact very large pictures might have on the jury.
>
> The photographs were reviewed in sequence, but for unexplained reasons those designated People's exhibits 17 and 26 had not been loaded onto the prosecutor's compact disc. The prosecutor said he would give defense counsel a copy of the disc he would use at trial. The defense did not object to photographs of the grave site before the corpse was fully unearthed, including two in which the upper part of the corpse was exposed. It did object to enlarged images of the corpse itself. The court sustained the objection, ruling that the magnified pictures of the corpse were "unduly prejudicial in terms of their emotional impact on the jurors."
>
> At trial, on August 1, 2002, the prosecutor used the projector while questioning a lieutenant about the crime scene investigation. Before showing any images, the prosecutor noted, "My recollection is that the body in the grave was not objected to." The court remembered that the objection was to autopsy photos. Defense counsel had no specific recollection but said, "I think it was not objected to." As the prosecutor went through the photographs with the lieutenant on the stand, he showed exhibits 17 and 26, which portrayed the corpse exposed in the grave from different angles, with a plastic bag wrapped around the head. No objection was made, but after displaying these pictures the prosecutor suggested taking a break. The court replied that it was 25 minutes until the next scheduled break. The prosecutor requested a bench conference and explained, "There are several jurors that are in a highly emotional state at this point, and I thought maybe a moment so that they could gather themselves." The court demurred, saying, "I don't think so."

/////

33

The prosecutor then moved for admission of the exhibits used with this witness.  The court asked if there were objections, and defense counsel objected to "the last" exhibits.  The court deferred ruling until the next break.  At that time, counsel objected to People's exhibits 10, 17, 26, and 27.[14]  Counsel did not complain about the size of the projected photographs, or their omission from pretrial review.  He argued that using this many photographs of the corpse was cumulative and prejudicial, and claimed it was obvious from the jury's reaction that the photographs were "having an impact."  The court overruled the objection.  Cocounsel then advised the court that defendant had told him some of the photographs shown by the prosecutor had not been shown in the pretrial review.  Counsel asked only for an order that no further photographs be displayed unless defense counsel were given an opportunity to review them and make sure they were previously approved by the court.   The prosecutor had no objection, and the court so directed.

[N.14 Exhibit 10 showed the grave partially excavated, with some upper portions of the corpse exposed. During the pretrial review, defense counsel said he did not have a problem with this photograph. The other three photographs were not included in the pretrial review.]

The guilt phase concluded on August 28, 2002.  On September 17, during the penalty phase, the defense moved for a mistrial on [the] ground that it was prosecutorial misconduct to display exhibits 17 and 26 without prior authorization.  The prosecutor pointed out that before showing the photographs, he had notified the court and counsel of his recollection that no objection had been raised to photographs of the body in the grave.  Defense counsel responded that the prosecutor had violated the court's directive regarding photographs that were not preapproved.   The court denied the motion.  It found no indication that any violation of its order was intentional, and no prosecutorial misconduct.   The court also determined that defendant had not been prejudiced. If the photographs had been shown in advance, the court "certainly would have approved the use of at least one. The other was simply cumulative."

On appeal, defendant renews his argument that the prosecutor violated the court's order not to use unapproved photographs. Defendant forfeited this claim by failing to promptly object at trial. To preserve a claim of prosecutorial misconduct, a defendant must make a *timely* and *specific* objection and ask the court for a curative instruction. (*People v. Clark* (2011) 52 Cal.4th 856, 960, 131 Cal.Rptr.3d 225, 261 P.3d 243.)  Here, had a prompt objection been made, the photographs could have been removed from view and the jurors admonished.  Defendant insists that he did object after all the photographs were shown, and that the court's overruling of the objection showed it would have been futile to object immediately. (See *Clark,* at p. 960, 131 Cal.Rptr.3d 225, 261 P.3d 243.)  However, when the court heard argument on the objection, counsel did not specifically raise the preapproval point, merely noting belatedly that some unspecified photographs had not been included in the pretrial review.

1

2

3

4

5

6

It was only when seeking a mistrial, as the penalty phase was underway, that the defense pointed out that exhibits 17 and 26 had not been approved by the court. Defendant does not claim the court erred by failing to grant a mistrial. He does, however, object to the court's finding that any violation of its order was unintentional, noting that prosecutorial misconduct need not be intentional. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823, 72 Cal.Rptr.2d 656, 952 P.2d 673.) The Attorney General responds on the merits of the mistrial ruling, arguing there was no misconduct because the exhibits in question were never ruled inadmissible, and there was no prejudice in any event.

7

8

9

10

11

12

13

14

15

Even if a claim associated with the projection of these photographs had been preserved and properly presented here, there was no error. The prosecutor's apparently inadvertent failure to secure pretrial review of these particular exhibits did not infect the trial with such unfairness as to make defendant's conviction a denial of due process. *People v. Clark, supra,* 52 Cal.4th at p. 960, 131 Cal.Rptr.3d 225, 261 P.3d 243 [federal standard for prosecutorial misconduct].) It did not amount to a deceptive or reprehensible method of persuasion. (*Ibid.* [state law standard for prosecutorial misconduct].) Nor were defendant's chances of receiving a fair trial irreparably damaged. (*People v. Ayala* (2000) 23 Cal.4th 225, 282, 96 Cal.Rptr.2d 682, 1 P.3d 3 [standard for grant of mistrial].) Furthermore, given the overwhelming evidence of defendant's guilt, including his confession and the detailed testimony of three coperpetrators, any error would have been harmless under any standard of prejudice.

16

(ECF No. 22, Lodged Doc. 124 at 40-44.)

17

18

19

20

21

22

23

24

Prosecutorial misconduct provides a basis for habeas corpus relief if the actions of the prosecution "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Parker v. Matthews, 567 U.S. 37, 45 (2012) (per curiam). Even if there were prosecutorial misconduct, habeas relief is only warranted if petitioner can establish that the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted); see also Parle v. Runnels, 387 F.3d 1030, 1044 (9th Cir. 2004).

25

26

27

28

Here, petitioner takes issues with exhibits 17 and 26, which are photographs of the victim's nude body in the grave with a black plastic bag on the victim's head. (ECF No. 22, Lodged Doc. 26 at 26CT6136, 46.) In pretrial proceedings, the trial court did not rule on the admissibility of the exhibits because the prosecutor failed to include them on a compact disc with

1    the other exhibits.  (ECF No. 22, Lodged Doc. 91 at 23RT6207-19.)  The trial court told the

2    attorneys that it would address the use of enlarged photographs as the need arose during trial.

3    (ECF No. 22, Lodged Doc. 93 at 25RT6966.)  Before displaying the exhibits during trial, the

4    prosecutor recalled that "the body in the grave was not objected to," and defense counsel agreed,

5    stating "I think it was not objected to."  (ECF No. 22, Lodged Doc. 100 at 32RT9069.)  After

6    displaying the photographs of the crime scene to the witness, including exhibits 17 and 26,

7    defense counsel objected on the grounds that the exhibits were cumulative and prejudicial.  (ECF

8    No. 22, Lodged Doc. 101 at 33RT9123.)  The court overruled the objection and ordered that any

9    additional photographs be preapproved before projecting them before the jury.  (Id. at

10   33RT9125.)  During the penalty phase of trial, defense counsel moved for a mistrial on the

11   grounds that the prosecutor displayed exhibits 17 and 26 without prior authorization.  (ECF No.

12   22, Lodged Doc. 26 at 26CT6112-15.)  The trial court denied the motion, finding that had the

13   photos been shown in advance, the court would have approved at least one of them and the other

14   exhibit was merely cumulative.  (ECF No. 22, Lodged Doc. 124 at 42.)

15          After reviewing the record, this Court concludes that the state court's finding that the

16   photographs did not deny petitioner a fair trial was not objectively unreasonable.  The trial court

17   determined that at least one of the exhibits was admissible.  A prosecutor does not commit

18   misconduct by showing the jury admissible evidence.  See United States v. Hinton, 31 F.3d 817,

19   824 (9th Cir. 1994).  The trial court also found that the other exhibit was cumulative.  Because the

20   Supreme Court has not made a clear ruling that admission of irrelevant or unduly prejudicial

21   evidence constitutes a violation of due process, this Court cannot conclude that the state court's

22   ruling was contrary to, or an unreasonable application of, clearly established federal law.  See

23   Holley, 568 F.3d at 1101.  This Court agrees with the trial court that there is overwhelming

24   evidence of petitioner's guilt in the record; two photographs of the victim's body at the grave site

25   could not have had a substantial or injurious effect in determining the jury's verdict.[6]

26   /////

27

28   _____

[6] Because this claim fails on the merits, this Court does not reach the procedural bar issue.

36

1       G.   <u>Restraints During Trial (Claim 6)</u>

2          In his sixth claim, petitioner asserts that he was forced to wear unnecessarily harsh and

3 visible restraints during his trial in violation of his rights under the Sixth, Eighth, and Fourteenth

4 Amendments.[7]  (ECF No. 1 at 9.)  In response, respondent argues that petitioner cannot

5 demonstrate that the state court's ruling that restraints were warranted was not contrary to or an

6 unreasonable application of Supreme Court authority, nor was the use of nonvisible restraints

7 prejudicial.  (ECF No. 21 at 46-50.)

8          The California Supreme Court addressed this claim as follows:

> On May 8, 2002, during pretrial proceedings, defense counsel objected to the placement of a stun device on defendant's arm, in addition to the leg brace the court had approved for security purposes. The brace locked the leg in an extended position, making it impossible to run. The court observed that the device on defendant's arm was visible, and that any stun device or visible restraint would require a showing of manifest need. The prosecutor referred to defendant's lengthy record of violence and recalcitrance in jail, and his plans to escape. A sergeant with the Shasta County Marshal's Office testified briefly about the security risk posed by defendant. The court continued the hearing to resume jury selection, and ordered the interim removal of the stun device.
>
> On May 10, the court held a lengthy hearing on the issue of restraints. The sergeant returned to the stand. He recounted the incident in which defendant asked his wife to take pictures of the jail's exterior and told her he was planning to escape just before his trial began. The sergeant noted defendant's lengthy history of misconduct in custody, which resulted in the court's ordering him to be held in state prison for a period before trial. On the day he returned to county jail, defendant had tried to fight with a deputy and was subdued with pepper spray. Weapons had been discovered in his possession many times. In the courtroom he had access to pens, which could be used as a weapon. The sergeant asked that defendant be restrained with belly chains, leg irons, and handcuffs while in court.
>
> A private investigator testified for the defense regarding his observations and understanding of defendant's conduct in custody. The court ruled that, in light of defendant's long history of nonconforming conduct in custody and his demonstrated interest in escaping, he would be restrained with the leg brace and a stun device on his leg. The court declined to impose any visible restraints.
>
> A month later, defendant launched the escape attempt in which Deputy Renault was assaulted. Three days after that, the court held

---

[7] To the extent petitioner challenges the restraints used during the penalty phase of his trial, that argument is moot because the California Supreme Court vacated his death sentence.

a hearing on the use of additional restraints.  The marshal's office again asked for belly chains and leg irons.  The court took testimony about the escape attempt and how the stun device worked.  Defense counsel argued that the stun device was sufficient, making shackles unnecessary.   In view of defendant's persistent misconduct in custody, and especially his recent escape attempt, the court approved the use of belly chains and leg irons.  It ordered that paper be placed around the defense table so the jurors could not see beneath it.

On September 11, 2002, during the penalty phase, counsel reported that defendant was developing painful scabs on his ankles.  A medical examination conducted the same day revealed minor lacerations over the Achilles tendon on both ankles. They were healing without sign of infection, and calluses were forming below them. The court reviewed the medical report the next day. Defense counsel asked that the leg irons be removed during the lunch break. The bailiff objected, noting that security in the court's holding facility was less comprehensive than in the jail, and emphasizing defendant's history of manufacturing weapons and attempting to escape.  The request was denied.

Defendant concedes that the showing of manifest need for shackling was sufficient. (See *People v. Howard* (2010) 51 Cal.4th 15, 28, 118 Cal.Rptr.3d 678, 243 P.3d 972.)  Nevertheless, he claims shackling that causes pain and scarring is excessive and violates due process. Defendant cites no authority for the proposition that, even when the need for shackling is manifest, the restraints must be removed if they cause discomfort or abrade the skin.  In any event, the record here shows only minor injuries, healing without complication. No due process violation can be conjured from this scenario. Defendant claims the shackles were visible to the jury, but the record does not support his assertion.[12]

[N.12  The only record reference defendant provides is to an advisement given by the court during jury selection.  The prosecutor requested the admonition, after notifying the court that defense counsel had defendant stand up when the panel of potential jurors came in, at which point his leg and waist chains were visible. Defense counsel said he was "deliberately not requesting" an advisement.  He thought it unnecessary until a jury was actually impaneled, but did not object to the prosecutor's request.

The court told the panel that security measures in the courtroom had nothing to do with the issues, and "so to the extent that you see certain security measures taken, which can include the number of bailiffs in the courtroom, the kinds of restraints that may or may not be placed on the defendant, those are issues not for your consideration, and you may not consider them in any way in reaching the determination that you're asked to make." This general admonition, given by the court before leg irons were employed and before the jury was selected, reflects nothing about whether shackles were visible during trial.]

Defendant argues briefly that the use of a stun device was unwarranted, citing *People v. Mar* (2002) 28 Cal.4th 1201, 124

38

1
2
3
4
5

> Cal.Rptr.2d 161, 52 P.3d 95. There we held that stun belts, like shackles, may be justified by a showing of manifest need. (*Id*. at pp. 1219–1220, 124 Cal.Rptr.2d 161, 52 P.3d 95; *see also People v. Duran* (1976) 16 Cal.3d 282, 290–293, 127 Cal.Rptr. 618, 545 P.2d 1322.) Here, defense counsel conceded the stun device was appropriate, forfeiting the claim of error under *Mar*. In any event, defendant does not challenge the court's finding of manifest need. He fails to show any error in connection with the court's authorization of restraints in the courtroom.

6
(ECF No. 22, Lodged Doc. 124 at 32-34.)

7
8
9
10
11
12
13
14
15

The Supreme Court has held that the "Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." Deck v. Missouri, 544 U.S. 622, 624 (2005); see also Brown v. Davenport, 142 S. Ct. 1510, 1529-30 (2022). To succeed on this claim, petitioner must show that he was shackled in the presence of the jury, the jury saw him shackled, and the shackles were not justified by state's interests. Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002). The court must then determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

16
17
18
19
20
21
22
23
24
25
26
27
28

Here, petitioner has not shown that the state court's decision to affirm the trial court's order restraining petitioner during trial was objectively unreasonable. The Ninth Circuit has found that a trial court's conclusion, that an escape risk or possibility of harm to persons in the courtroom is a justifiable state interest warranting leg restraint, was not contrary to, or an unreasonable application of, federal law. See Hedlund v. Ryan, 854 F.3d 557, 569 (9th Cir. 2017); see also Hamilton v. Vasquez, 882 F.2d 1469, 1471 (9th Cir. 1989) ("Shackling is proper where there is a serious threat of escape or danger to those in and around the courtroom, or where disruption in the courtroom is likely if the defendant is not restrained."). In this case, there is evidence in the record supporting the state court's decision that there was a manifest need for restraint. Before trial, defense counsel agreed to a leg brace but objected to a stun device. (ECF No. 22, Lodged Doc. 76 at 8RT1842-51.) The trial court held a hearing on whether there was a manifest need for the restraints. Witnesses testified that petitioner had possessed weapons in jail, destroyed prison property, fought with inmates and staff, and engaged in other disciplinary

1  conduct that required him to be transferred from jail to a state prison for four years during pretrial

2  proceedings.  (Id.; ECF No. 22, Lodged Doc. 77 at 9RT2165-230; see also ECF No. 22, Lodged

3  Doc. 4 at 4CT549-609.)  During this hearing, the marshal requested that petitioner be restrained

4  with belly chains and leg irons in addition to a leg brace and stun device because petitioner had

5  planned a jail escape in 1999.  (ECF No. 22, Lodged Doc. 77 at 9RT2166.)  The trial court also

6  heard testimony about the various levels of restraints, including their visibility to the jury.  (Id. at

7  9RT2203-10.)  After considering the evidence, the trial court determined there was a manifest

8  need for restraints based on petitioner's long history of nonconforming conduct in jail and escape

9  risk and ordered that petitioner wear a leg brace and stun device on his leg—the less restrictive

10  restraints that would not be visible to the jury.  (Id. at 9RT2230-31.)

11      After petitioner's attempted jail escape on June 22, 2002, the prosecutor requested

12  additional restraints, and the trial court held a hearing on the issue.  (ECF No. 22, Lodged Doc. 88

13  at 20RT5436-67, 5475-96.)  The escape attempt included length of ropes, a bludgeoning device,

14  tampered cell door locks, beds made to look as if they were occupied, a garrote, and an attack on

15  a correctional officer resulting in a fractured skull and jaw, a concussion, and a brain bleed.  (Id.

16  at 20RT5437-40, 5461.)  The trial court concluded there was a manifest need for belly chains and

17  leg irons in addition to a stun device and leg brace after the attempted escape.  (Id. at 20RT5494-

18  96.)  After reviewing the record, this Court concludes that the state court's decision to affirm the

19  use of restraints was reasonable.

20      Even if there was a manifest need for restraints, petitioner claims that the use of leg

21  shackles caused him pain and scarring violating his federal constitutional rights.  (ECF No. 22,

22  Lodged Doc. 121 at 213-14.)  This claim is unsupported by the facts.  Defense counsel raised this

23  issue before the court during trial, and the court ordered a medical examination.  The medical

24  report noted only "minor lacerations" on his ankles.  (ECF No. 22, Lodged Doc. 28 at 28CT6849-

25  52 ("1/4 laceration over upper achilles tendon on both ankles, both healing lacerations show no

26  sign of infection, some callous formation over lower achilles tendon, active full range of motion

27  in both ankles."))  These minor lacerations are not sufficient to establish a constitutional

28  violation.

Lastly, petitioner claims that use of visible restraints violated his due process rights.  But even visible restraints do not violate a defendant's due process rights if the restraints are justified by an essential state interest.  Larson v. Palmateer, 515 F.3d 1057, 1063 (9th Cir. 2008). Assuming the restraints were visible, as explained above, the restraints were justified by the court's interest in preventing an escape risk and any harm to persons in the courtroom.  However, in this case, there is no evidence that the restraints were visible to the jury.  To the contrary, the trial court ordered butcher paper to cover the underside of the defense table to hide the restraints. (ECF No. 22, Lodged Doc. 88 at 20RT5496.)  Despite petitioner's argument to the contrary, the trial court's admonishment to prospective jurors is not sufficient to prove that petitioner's restraints were visible to the jury; the admonishment merely indicated that some security measures may or may not be taken during the trial.  (ECF No. 22, Lodged Doc. 90 at 22RT5949 ("So to the extent that you see certain security measures taken, which can include the number of the bailiffs in the courtroom, the kinds of restraints that may or may not be placed on the defendant, those are issues not for your consideration, and you may not consider them in any way in reaching the determinations that you're asked to make."))  Because the use of concealed restraints was justified, the restraints did not violate his due process rights.

Based on a review of the record, this Court concludes that the California Supreme Court's conclusion was not contrary to, or an unreasonable application of, Supreme Court precedent and recommends denying habeas relief on this claim.

H.  Insufficient Evidence of Torture Special Circumstance (Claim 7)

In Claim 7, petitioner argues that there is insufficient evidence to support the torture-murder special circumstance because there is no proof that he intentionally inflicted cruel pain and suffering for any sadistic purpose.  (ECF No. 1 at 10.)  In response, respondent argues that petitioner cannot demonstrate that the state court's ruling was contrary to or an unreasonable application of Supreme Court authority.  (ECF No. 21 at 52-53.)

The California Supreme Court considered his claim and rejected it.

> Defendant contends the evidence was insufficient to support the jury's finding of torture. "The torture-murder special circumstance requires proof that a defendant intentionally performed acts that were

41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

calculated to cause extreme physical pain to the victim. [Citation.] Required is 'an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose.' [Citation.] We review the entire record, in the light most favorable to the prosecution, to determine whether a rational trier of fact could have found the essential elements of the torture-murder special-circumstance allegation beyond a reasonable doubt. [Citations.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1136, 81 Cal.Rptr.3d 614, 189 P.3d 880 (*Mungia* ).) "A premeditated intent to inflict prolonged pain is not required." (*People v. Elliot* (2005) 37 Cal.4th 453, 479, 35 Cal.Rptr.3d 759, 122 P.3d 968.)

The intent to torture "is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds." (*People v. Crittenden* (1994) 9 Cal.4th 83, 141, 36 Cal.Rptr.2d 474, 885 P.2d 887.)

Defendant claims the evidence showed no attempt on his part to increase the victim's suffering or inflict pain in addition to the pain of death. He compares this case to *Mungia,* where evidence of a savage beating did not suggest an attempt to torture the victim rather than simply to kill her. (*Mungia, supra,* 44 Cal.4th at p. 1137, 81 Cal.Rptr.3d 614, 189 P.3d 880.) The comparison is inapt. Here, by his own admission, defendant told Sinner she was going to kill herself, and forced her to cut her own wrist. He then cut her wrist himself and poured whiskey over the wounds several times, despite the obvious pain this caused. He also kicked Sinner and struck her with the metal bar when she moved her hands away from the fire pit. His claim that he was only trying to ease the way to an inevitable death is undermined by the sadism demonstrated by his conduct. The evidence of torture was sufficient.

19  (ECF No. 22, Lodged Doc. 124 at 44-45.)

20       A petitioner is entitled to habeas corpus relief on a sufficiency of the evidence claim "if it

21  is found that upon the record evidence adduced at the trial no rational trier of fact could have

22  found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979);

23  see also Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). This inquiry involves two steps.

24  First, the federal court must review the evidence in the light most favorable to the prosecution.

25  Jackson, 443 U.S. at 319. If there are conflicting factual inferences, the federal court must

26  presume the jury resolved the conflicts in favor of the prosecution. Id. at 326 ("[A] federal

27  habeas corpus court faced with a record of historical facts that supports conflicting inferences

28  must presume—even if it does not affirmatively appear in the record—that the trier of fact

1  resolved any such conflicts in favor of the prosecution, and must defer to that resolution.");

2  McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam).  Second, the federal court will

3  "determine whether the evidence at trial, including any evidence of innocence, could allow *any*

4  rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."

5  United States v. Nevils, 598 F.3d 1158, 1165 (9th Cir. 2010) (en banc).  Although this Court's

6  review is grounded in due process under the Fourteenth Amendment, the Jackson standard "must

7  be applied with explicit reference to the substantive elements of the criminal offense as defined

8  by state law."  Jackson, 443 U.S. at 324 n.16; Juan H. v. Allen, 408 F.3d 1262, 1275-76 (9th Cir.

9  2005).  This Court will look to state law to establish the elements of the offense and then turn to

10  the federal question of whether the state court was objectively unreasonable in concluding that

11  sufficient evidence supported that conviction.  See Johnson v. Montgomery, 899 F.3d 1052, 1056

12  (9th Cir. 2018).

13      "After AEDPA, we apply the standards of *Jackson* with an additional layer of deference."

14  Juan H., 408 F.3d at 1274; see Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam).  On

15  direct appeal at the state level, "it is the responsibility of the jury—not the court—to decide what

16  conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the

17  jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

18  agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).  On habeas review,

19  "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence

20  challenge simply because the federal court disagrees with the state court.  The federal court

21  instead may do so only if the state court decision was 'objectively unreasonable.'"  Id. (quoting

22  Renico v. Lett, 559 U.S. 766, 773 (2010)).

23      Under California Penal Code section 190.2, subd. (a)(18), the prosecution has to prove the

24  following to substantiate the special circumstance of torture:

25          1.  The murder was intentional; and

26          2.  The defendant intended to inflict extreme cruel physical pain and
            suffering upon a living human being for the purpose of revenge,
27          extortion, persuasion of for any other sadistic purpose; and

28  /////

3. The defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration.

Cal. Jury Instr. Crim. 8.81.18. The trial court read this instruction to the jury. (ECF No. 22, Lodged Doc. 25 at 25CT5993.)

After reviewing the evidence in the light most favorable to the prosecution, this Court concludes that it was not objectively unreasonable for the state court to conclude that there was sufficient evidence to support the jury's true finding of the torture special. There is sufficient evidence to satisfy all three elements.

First, there is sufficient evidence that the murder was intentional. A few days before the murder, petitioner told the other perpetrators that Lora should be killed. (ECF No. 22, Lodged Doc. 96 at 28RT7849; see also ECF No. 22, Lodged Doc. 101 at 33RT9313.) During the night of the murder, petitioner told the other perpetrators that they "needed to finish what [they] started." (ECF No. 22, Lodged Doc. 95 at 27RT7389; see also ECF No. 22, Lodged Doc. 96 at 28RT7878; ECF No. 22, Lodged Doc. 98 at 30RT8411.) He also told the victim that she was going to kill herself and that it would look like a suicide. (Id. at 28RT7901-03.) Petitioner put a bag over the victim's head so she would "die quicker." (ECF No. 22, Lodged Doc. 98 at 30RT8427.)

Second, the record contains evidence that petitioner intended to inflict extreme cruel physical pain and suffering upon the victim for sadistic purpose. At one point, petitioner hog tied the victim's hands and feet and put a noose around her neck. (ECF No. 22, Lodged Doc. 95 at 27RT7355; ECF No. 22, Lodged Doc. 96 at 28RT7896,7900-01; ECF No. 22, Lodged Doc. 98 at 30RT8419.) Petitioner also cut the victim on the wrists with a broken razor blade, poured whisky on the cuts, and held her wrists over a firepit. (ECF No. 22, Lodged Doc. 95 at 27RT7387-89; ECF No. 22, Lodged Doc. 96 at 28RT7909; see also ECF No. 22, Lodged Doc. 98 at 30RT8415, 8424.) After this, he placed a plastic grocery bag over the victim's head and hit her in the neck, resulting in a bone breaking, cracking sound. (ECF No. 22, Lodged Doc. 95 at 27RT7389,7397-99; ECF No. 22, Lodged Doc. 98 at 30RT8426-27.) At one point, a co-perpetrator told petitioner "to stop, this is getting too deep. You're going too far." (ECF No. 22, Lodged Doc. 98 at

/////

44

1   30RT8429.)  But despite these pleas, petitioner did not stop, stating that the victim is going to die

2   anyway.  (Id. at 8430.)

3         Lastly, petitioner did inflict extreme cruel physical pain and suffering upon the victim.

4   (See ECF No. 22, Lodged Doc. 95 at 27RT7354, 7379, 7386-87; ECF No. 22, Lodged Doc. 96 at

5   28RT7907-11, 7918-20.)  This Court concludes that the California Supreme Court's finding was

6   not contrary to, or an unreasonable application of, Supreme Court precedent and recommends

7   denying habeas relief on this claim.

8         I. Constitutionality of Torture Special Circumstance (Claim 8)

9         Next petitioner argues that the torture special circumstance is "insufficiently narrow" in

10  violation of his constitutional rights.  (ECF No. 1 at 10; see also ECF No. 22, Lodged Doc. 121 at

11  221-24.)  He claims that the phrase "for any sadistic purpose" renders the jury instruction

12  "unconstitutionally vague and overbroad, as it establishes a catch-all category into which almost

13  all murders could fall."  (ECF No. 22, Lodged Doc. 121 at 222.)

14        The California Supreme Court reviewed the claim and concluded that it lacked merit.

15        Defendant claims the torture special circumstance fails to perform
          the constitutionally required narrowing function meant to avoid
16        arbitrary imposition of the death penalty, and therefore violates the
          Eighth and Fourteenth Amendments.  We have rejected this
17        argument on a number of occasions.  (E.g., *People v.
          Whisenhunt* (2008) 44 Cal.4th 174, 223, 79 Cal.Rptr.3d 125, 186
18        P.3d 496; *People v. Barnett* (1998) 17 Cal.4th 1044, 1160–1163, 74
          Cal.Rptr.2d 121, 954 P.2d 384; *People v. Raley* (1992) 2 Cal.4th 870,
19        898–900, 8 Cal.Rptr.2d 678, 830 P.2d 712 (*Raley*).)  Defendant
          argues that the phrase "for any sadistic purpose" in the instruction
20        given to his jury is vague and overbroad.[15]  He notes that in *Raley*, we
          quoted dictionary definitions focusing on a sexual element in sadism.
21        (*Raley*, at p. 900, 8 Cal.Rptr.2d 678, 830 P.2d 712.) Defendant
          contends there was no evidence of sexual motivation in this case, and
22        therefore no sadism. Insofar as defendant suggests the "sadistic
          purpose" element of the special circumstance is too *narrow* to apply
23        here, his claim of overbreadth is misplaced.  In any event, our
          discussion in *Raley* was not so limited.
24
          [N.15 The jury heard CALJIC No. 8.81.18, which included the
25        following element: "The defendant intended to inflict extreme cruel
          physical pain and suffering upon a living human being for the
26        purpose of revenge, extortion, persuasion or for any sadistic
          purpose."]
27
          *Raley* held there was no need to instruct the jury on the meaning of
28        "sadistic purpose" because the phrase is one "in common usage,

1
2
3
4
5

> having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure." (*Raley, supra,* 2 Cal.4th at p. 901, 8 Cal.Rptr.2d 678, 830 P.2d 712.) Although sadism is commonly associated with sexual pleasure, courts have recognized that it does not necessarily have a sexual motivation. (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1203, 68 Cal.Rptr.2d 619; *People v. Healy* (1993) 14 Cal.App.4th 1137, 1142, 18 Cal.Rptr.2d 274.) Defendant fails to undermine our settled view on the constitutional sufficiency of the torture special circumstance.

6   (ECF No. 22, Lodged Doc. 124 at 46-47.)

7   In California, to sentence a defendant to death for first degree murder, the jury must find

8   the defendant guilty and find as true one of the special circumstances listed in California Penal

9   Code section 190.2.  See Tuilaepa v. California, 512 U.S. 967, 969 (1994).  States' capital

10  punishment schemes, including California's scheme, involve both an eligibility decision and the

11  selection decision.  See Hidalgo v. Arizona, 138 S. Ct. 1054, 1054 (2018) (denying petition for

12  writ of certiorari).  The eligibility decision, which is at issue here, imposes a "narrowing"

13  requirement; "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely

14  narrow the class of persons eligible for the death penalty and must reasonably justify the

15  imposition of a more severe sentence on the defendant compared to others found guilty of

16  murder.'"  Id. (citation omitted).  To meet this requirement, the state legislature must adopt

17  statutory factors to determine if the defendant is eligible for the death penalty and, as result,

18  "'limit the class of murderers to which the death penalty may be applied.'"  Id. (citing Brown v.

19  Sanders, 546 U.S. 212, 216 & n.2 (2006)).

20  Here, petitioner claims he is entitled to federal habeas relief because the phrase "for any

21  sadistic purpose" in the torture special circumstance statute is unconstitutionally vague.  This

22  claim fails.  The California Supreme Court has determined that the torture-murder special

23  circumstance is consistent with the Eighth and Fourteenth Amendments.  See, e.g., People v.

24  Whisenhunt, 44 Cal. 4th 174, 223 (2008); People v. Barnett, 17 Cal. 4th 1044, 1162 (1998);

25  People v. Raley, 2 Cal. 4th 870, 898-900 (1992).  Petitioner has not identified any Supreme Court

26  precedent, nor is this Court aware of any, finding that the challenged phrase is unconstitutionally

27  vague.  See Davis v. Johnson, 359 F. Supp. 3d 831, 861-64 (N.D. Cal. 2019).  The general

28  principle that criminal statutes are invalid if unconstitutionally vague cannot provide a basis for

1   habeas relief.  See Johnson v. United States, 576 U.S. 591, 597 (2015); Woods v. Donald, 572

2   U.S. 312, 317 (2015) (per curiam) (stating that "if the circumstances of a case are only 'similar

3   to' [Supreme Court] precedents, then the state court's decision is not 'contrary to' the holdings in

4   those cases").  This Court concludes that state court's rejection of his claim was not contrary to or

5   an unreasonable application of federal law and recommends denying habeas relief on this claim.

6           J. Cumulative Error Claim (Claim 13)

7           Lastly, petitioner asserts the multiple constitutional errors in the guilt and penalty phases

8   of his trial warrant federal habeas relief.  Because the California Supreme Court vacated his death

9   sentence, his argument with respect to the penalty phase cumulative errors is moot.

10          The Ninth Circuit has concluded that under clearly established United States Supreme

11  Court precedent the combined effect of multiple trial errors may give rise to a due process

12  violation if it renders a trial fundamentally unfair, even where each error considered individually

13  would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly,

14  416 U.S. at 643, and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  "[T]he fundamental

15  question in determining whether the combined effect of trial errors violated a defendant's due

16  process rights is whether the errors rendered the criminal defense 'far less persuasive,' and

17  thereby had a 'substantial and injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d

18  at 928 (internal citations omitted); see also Hein, 601 F.3d at 916.

19          Having addressed each of petitioner's claims, this Court concludes that no error of

20  constitutional magnitude occurred.  The alleged errors, even when considered together, did not

21  render petitioner's defense "far less persuasive," nor did they have a "substantial and injurious

22  effect or influence on the jury's verdict."  Accordingly, petitioner is not entitled to relief on his

23  claim of cumulative error.

24  IV.  Conclusion

25          For all of the foregoing reasons, the court will recommend that petitioner's petition for a

26  writ of habeas corpus be denied, and this case be closed.

27  /////

28  /////

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's petition for a writ of habeas corpus (ECF No. 1) be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 8, 2022

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

20
smit1015.157

48